## SIDNEY J. GEFEN AND LOIS I. GEFEN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 18900-82.     Filed December 30, 1986.

*Daniel S. Abrams* and *Gerald A. Rosenberg*, for the petitioners.

*Marwin A. Batt*, *Roland Barral*, and *Robert A. Wagner*, for the respondent.

STERRETT, *Chief Judge*: By notice of deficiency dated April 27, 1982, respondent determined deficiencies in petitioners' Federal income taxes for the calendar years 1977, 1978, and 1979 in the amounts of $10,513.66, $8,376.65, and $9,420.60, respectively. By amendment to his answer, respondent alleged that the correct deficiency for 1977 is $10,479.00, and that the deficiencies for 1978 and 1979 should be increased in the amounts of $7,692.35 and $1,546.40, respectively. The deficiencies resulted from respondent's determination that petitioners were not entitled to deduct losses and interest expenses attributable to an investment by petitioner Lois I. Gefen in a limited partnership. After concessions, the issues for decision are (1) whether the partnership's transactions were supported by economic substance; (2) whether the partnership was engaged in an activity for profit; (3) whether petitioner Lois I. Gefen was entitled to include in her partnership basis her allocable share of partnership liabilities; and (4) whether petitioner Lois I. Gefen was at risk within the meaning of

section 465[1] for her allocable share of the partnership's recourse indebtedness.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioners Sidney J. Gefen and Lois I. Gefen are husband and wife. At the time the petition was filed in this case, they resided in Jacksonville, Florida. Their joint Federal income tax returns for the years in question were filed with the Office of the Internal Revenue Service in Atlanta, Georgia.

### The Partnership

Dartmouth Associates (the partnership) was formed in 1976 by Integrated Resources, Inc. (Integrated), as a limited partnership under the Uniform Limited Partnership Act of the State of Connecticut.[2] Integrated formed the partnership in order to have a partnership available for investment in real estate. The partnership's limited partnership agreement and certificate of formation of limited partnership were amended on or before July 27, 1977, to permit the partnership to enter into the trade and business of owning and leasing computer equipment.

The general partners of the partnership were IR-Oak Corp. (IR-Oak), a wholly owned subsidiary of Integrated, and Bernard Kaplan, the president of Underwriters' Service Agency, Inc., also a wholly owned subsidiary of Integrated. IR-Oak and Bernard Kaplan contributed in cash $5,060 and $506, respectively, as their capital contributions to the partnership. Donald Olsen, the initial limited partner, contributed in cash $506 as his capital contribution to the partnership.

In July of 1977, the partnership acquired, and commenced the business of owning and leasing, computer equipment.

---

[1]Unless otherwise indicated, all sections referred to are sections of the Internal Revenue Code of 1954 as amended and in effect during the years in question, and all Rules referred to are Rules of the Tax Court Rules of Practice and Procedure.

[2]Integrated Resources, Inc., is a publicly owned corporation with shares traded on the New York Stock Exchange. Its primary lines of business are the structuring, marketing, and managing of investments for investors and the underwriting of insurance.

The equipment was manufactured by the International Business Machines Corp. (IBM), and was designated by IBM and known generally as a System 370 Model 168 computer. The partnership's gross income and deductions were derived principally from owning and leasing this computer equipment.

Commencing in September of 1977, the partnership distributed a confidential private placement memorandum (the confidential memorandum) and offered for sale to a limited number of qualified investors limited partnership interests aggregating a 98.8-percent interest in the partnership. Pursuant to this offering, the limited partners, other than the initial limited partner, contributed $499,928 as their aggregate capital contribution to the partnership.

The confidential memorandum stated that the partnership's investment objectives were the potential increase in equity in the computer equipment through the amortization of loans used to purchase the equipment; a small, net cash-flow during the term of the computer lease; a profit from the re-lease or sale of the equipment at the expiration of the lease; and current tax benefits. The confidential memorandum also contained discussions of the general economic, legal, and tax consequences of both the partnership's activities and an investment in the partnership.

Schedule A of the confidential memorandum projected that the partnership's investment in the computer equipment would generate tax losses in the early years of the investment but that, beginning in 1982, substantial taxable income would result, even though little net cash-flow was expected from the computer lease and even if the computer equipment had no value at the expiration of the lease.

Schedule B of the confidential memorandum projected the cumulative economic effects, after tax, of an investment in the partnership for investors in tax brackets of 55, 60, and 70 percent, using values of the computer equipment at the expiration of the lease of 0, 10, 16, 25, 30, and 40 percent of the equipment's original cost. This schedule indicated that an investor's return was dependent on the value of the computer equipment at the expiration of the lease (the residual value), and that an investor could expect an economic benefit from an investment in the partnership,

after tax, if the computer equipment retained a value of at least 16 percent of the equipment's original cost. Although the confidential memorandum provided no assurance that the computer equipment would have any residual value, it contained an appraisal of the equipment by an independent appraiser that stated that it was reasonable to expect that the equipment would have a value in excess of $745,000 at the expiration of the lease. Schedules A and B of the confidential memorandum appear in Appendix A attached hereto.

The partnership reported its income and expenses on the accrual method of accounting and used the calendar year as its taxable year. The partnership's books and business records consisted of checking account statements, checkbook stubs, accountant workpapers, and annual financial statements.

### *Petitioner's Interest in the Partnership, the Limited Partner Guarantee, and Petitioner's Obligation To Make Additional Contributions to the Partnership*

Petitioner Lois I. Gefen (petitioner) acquired her interest in the partnership by paying $24,996.50 (4.94 percent of the partnership's aggregate capital contributions) in cash to the partnership in October of 1977. She was a limited partner in the partnership on December 31 of each of the partnership taxable years 1977 through 1983. At all times relevant to this proceeding, she had a 4.94-percent interest in the partnership's capital, profits, and losses.

As a condition to her admission to the partnership as a limited partner, petitioner was required to and did execute and deliver to the partnership a limited partner guarantee (the guarantee). The guarantee stated that petitioner assumed personal liability for her pro rata share (4.94 percent) of the partnership's recourse indebtedness of $1,030,000. In pertinent part, the guarantee reads as follows:

#### *Dartmouth Associates Limited Partner Guarantee*

WHEREAS, the undersigned is a limited partner of Dartmouth Associates, a Connecticut limited partnership (the "Partnership") and

WHEREAS, The Partnership is personally liable under certain circumstances to Sun Life Insurance Company of America (the "Lender") for an aggregate amount of $1,030,000 (the "Recourse Amount") under the

terms, and subject to the conditions and limitations, of Section 5 of a Security and Loan Agreement (the "Loan Agreement"), dated as of June 15, 1977, as amended, between the Lender and the Partnership, such Recourse Amount constituting a portion of the indebtedness of the Partnership under the Loan Agreement.

WHEREAS, each of the limited partners (the "Limited Partners") of the Partnership, as a condition to their admission as Limited Partners, are required by the Partnership personally to guaranty a pro rata portion of the Recourse Amount.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, receipt of which is hereby acknowledged and subject to the conditions set forth below, *the undersigned assumes personal liability for repayment of a portion of the Recourse Amount* and guarantees to the Lender as follows:

1. Subject to the provisions of, and conditions and limitations set forth in, Paragraph 4 below, Section 5 of the Loan Agreement and Section 5(c) of the Limited Partnership Agreement (the "Partnership Agreement") of the Partnership, the undersigned hereby *unconditionally guarantees to the Lender, its successors and assigns, the due and prompt collection, in accordance with the terms thereof,* of up to $101,764 of the Recourse Amount per Unit of Limited Partnership Interest in the Partnership purchased by the undersigned.

2. This undertaking shall operate as a continuing guarantee and shall remain in full force and effect until January 1, 1982. *The undersigned's obligation hereunder is not contingent upon similar undertakings by other Limited Partners.* The Lender may demand the undersigned's performance in whole or in part without regard to the undersigned's rights against co-guarantors, but in any event, the undersigned shall not be obligated for more than the product of (a) that portion of the Recourse Amount demanded by the Lender at the time of default and (b) the undersigned's percentage interest in the profits and losses of the Partnership. * * *

\* \* \* \* \* \* \*

4. *If the assets of the Partnership securing the Recourse Amount pursuant to the terms of the Loan Agreement shall not be sufficient to repay the Recourse Amount to the Lender, when due, then, and in such event, the undersigned agrees to make additional capital contributions to the Partnership, subject, as to the time and amount thereof, to the provisions of paragraphs 1 and 2 hereof and in accordance with Section 5(c) of the Partnership Agreement. The obligations of the undersigned to make additional capital contributions shall not in any way derogate from the right of the Lender to proceed to enforce this Guarantee directly against the undersigned without first proceeding against the Partnership.* It is understood and agreed that the obligation of the undersigned hereunder and under the Partnership Agreement shall be limited to any deficiency remaining with respect to the Recourse Amount after the Lender shall have exhausted all its rights, powers and remedies under the Loan Agreement with respect to the assets of the Partnership initially

securing the Recourse Amount. In addition, the aggregate of the amount of additional capital contributions the undersigned shall be obligated to make and any amounts paid by the undersigned hereunder directly to the Lender shall in no event exceed the undersigned's proportionate share of the Recourse Amount based upon the undersigned's share of profits and losses in the Partnership. * * *

\* \* \* \* \* \* \*

6. The undersigned hereby authorizes the General Partners of the Partnership to act for and on behalf of the undersigned in all dealings with the Lender and the co-guarantors and acknowledges that the General Partners of the Partnership may act for the Lender or co-guarantors in enforcing the obligations of the undersigned. In the event the undersigned defaults in the payment of his obligations hereunder, the General Partners may, institute legal action to enforce such payment, and the undersigned hereby pledges to the General Partners his right to all Partnership distributions after the date of such default as security for payment of his obligations hereunder.

[Emphasis added.]

Petitioner also was obligated under section 5(c) of the amended and restated limited partnership agreement (the limited partnership agreement) to make a special contribution to the partnership under certain circumstances. Section 5(c) of the limited partnership agreement reads as follows:

(c) The Special Contribution of each Partner signatory to the counterpart of this Agreement shall be as specified in the Schedule of Partners' Contributions attached to this counterpart and shall be made by each such Partner pursuant to special calls therefor made on or before January 1, 1982 by the General Partner, such calls not to exceed, in any event, an aggregate amount equal to the product of such Partners's [sic] Distribution Percentage and $1,030,000. All Special Contributions by a Limited Partner shall be subject to the conditions and limitations of, and shall be in accordance with, the provisions of a certain Limited Partner Guarantee executed by such Limited Partner and a certain Security and Loan Agreement, dated as of June 15, 1977, between the Partnership and Sun Life Insurance Company of America, as amended.

Relevant portions of both the security and loan agreement, dated June 15, 1977, between the partnership and Sun Life, and the amendment to this agreement, appear in Appendix B attached hereto.

Under the terms of the limited partnership agreement, petitioner had no right to reimbursement from either the partnership or the general partners for amounts paid by her to the partnership as a special contribution or to Sun Life pursuant to the limited partner guarantee. Section 6(f) of

the limited partnership agreement provided that limited partners had no right to withdraw or reduce their special contributions to the partnership once made, and section 7(d) of the limited partnership agreement provided that the general partners were not liable to the limited partners for any loss or liability incurred in connection with any matter, except for losses or liabilities attributable to the willful misconduct or gross negligence of a general partner.

### Integrated's Decision To Enter
### the Computer Leasing Business

In the early spring of 1977, Stephen Goldsmith (Goldsmith), an employee of Integrated and later a vice president of IR-Oak, undertook a review of the computer leasing business on behalf of Integrated. Goldsmith's review included an analysis of recognized sources of historical computer industry information; a review of mass circulation business publications; discussions with Thomas McArdle (McArdle), the president of National Computer Rental (NCR), a computer leasing company; and a review of NCR's internal accounting and business records.

As a result of his investigation, Goldsmith discovered that in 1977, the Computer Price Guide, an authoritative source of information regarding selling prices of used computers, indicated that 12-year-old IBM 360 series computers, which were similar to but older than and not as advanced as the computer that was acquired by the partnership, were selling for prices as high as 25 percent of their initial cost. Goldsmith also discovered that NCR had a significant portfolio of IBM 360 series computers that were still under lease and generating significant revenue, and that in some cases, NCR was receiving in 1977 annual rent on its 360 series equipment equal to 25 percent of the annual rent it had received on the same equipment 12 years earlier. Goldsmith also was aware in 1977 that there were pessimistic predictions about the future of the used computer market, but he dismissed these predictions because he believed that they were too extreme.

Goldsmith decided that it was possible to make a profit in the computer leasing business and he presented the results of his investigation to the president of Integrated.

On the basis of the Goldsmith study, Integrated decided that it would participate in the computer leasing business either by investing for its own account or by sponsoring investment programs through limited partnerships.

## Origin of the Partnership's Transactions

In 1977, Exxon Corp. (Exxon) was leasing an IBM System 370 Model 168 central processing unit and related peripheral equipment from IBM for approximately $90,000 per month. The equipment had been installed by IBM, pursuant to the lease, at an Exxon facility located in Florham Park, New Jersey.

Exxon wanted to purchase the equipment from IBM, sell it to a purchaser-lessor, and lease it back. Such a transaction would enable Exxon, without making any capital investment, to lease the equipment for a longer term and smaller monthly payments than under its lease from IBM. Exxon solicited bids to assist it in structuring and implementing such a transaction, and it received bids from approximately six companies, including American Computer Sales & Leasing (ACSL), a broker of used computer equipment. Exxon accepted ACSL's bid.

Harry Ault (Ault), the founder of ACSL, approached McArdle and Goldsmith to see if their respective companies, NCR and Integrated, would be interested in participating in the Exxon transaction (the transaction). Ault first approached McArdle because he knew that NCR had an insurance policy from Lloyd's of London that would, in effect, guarantee the residual value of computer equipment in a computer leasing transaction, and thereby make it possible to obtain financing for such a transaction. McArdle in turn introduced Ault to Goldsmith.

Ault proposed that NCR purchase the computer equipment from Exxon, sell it to Integrated, lease it back from Integrated, and then sublease the equipment to Exxon.[3] It was anticipated that Exxon would be the end user of the equipment; NCR would provide the expertise and skills necessary to coordinate and complete the transaction and, by reason of its insurance policy with Lloyd's of London,

---

[3] A diagram of the completed transaction appears in Appendix C at p. 1510.

make financing possible; Integrated would own the equipment and provide the equity funds necessary to acquire it; and ACSL, in addition to bringing the parties together and facilitating negotiations, would remarket the equipment at the expiration of the leases. It was believed that the transaction would benefit the parties in the following ways: Exxon would reduce significantly its monthly rental payments for the equipment; NCR would earn a profit by selling the equipment to Integrated and also earn significant net cash-flow during the term of the lease to Exxon; Integrated would receive a small net cash-flow during the term of the lease to NCR, a profit from re-leasing or selling the equipment at the expiration of the lease, and current tax benefits; and ACSL would receive, in addition to a transaction fee, a portion of the proceeds from remarketing the equipment at the expiration of the lease.

Some of the negotiations with respect to the transaction took place before Integrated had decided whether it would participate in the transaction by investing for its own account or through an investment vehicle. Ultimately, Integrated decided that it would sponsor a limited partnership to participate in the transaction, and it decided that the partnership would be that limited partnership.

Acting on behalf of Integrated and later on behalf of the partnership, Goldsmith negotiated the terms of the transaction. In addition to negotiating the purchase price of the equipment, the term of the lease to NCR, the amount of rent to be paid by NCR, and the interest rate that would have to be paid to the lender, Goldsmith negotiated the terms of the remarketing agreement with Ault. Goldsmith rejected Ault's proposal that ACSL be given the exclusive right, with no time limit, to remarket the computer equipment upon the expiration of the lease. Instead, Goldsmith insisted that ACSL be given only 180 days to remarket the equipment. Goldsmith also insisted that the partnership's share of the remarketing proceeds be increased from 11 percent to 16 percent of the equipment's cost, and he requested that an appraisal of the computer equipment be prepared by an outside professional appraiser.[4] The negotiations over the

---

[4]The appraisal was prepared on or before Sept. 21, 1977, by Harvey N. Berlent, and was attached as an exhibit to the confidential memorandum. The appraisal stated that the fair

terms of the transaction sometimes went late into the night. Legal opinions also were obtained which assured the parties that the agreements were legal and enforceable under applicable non-tax laws. During the years in question, IBM, Exxon, Integrated, ACSL, and NCR were unrelated independent corporations.

## The Partnership's Acquisition of the Computer Equipment

The partnership acquired the computer equipment in two stages. The central processing unit and related peripheral equipment (the initial computer equipment) were acquired by the partnership on July 29, 1977. On September 1, 1977, the partnership acquired additional equipment (the upgrade) to expand the memory capacity of the initial computer equipment.

### Initial Acquisition Stage

On July 29, 1977, Exxon terminated its lease with IBM and purchased the initial computer equipment for $3,100,043. This price included a purchase credit from IBM.[5] On the same day, NCR purchased the initial computer equipment from Exxon for $3,146,430, and sold it to the partnership for $3,331,022.

NCR paid $46,387 to Exxon in connection with its purchase of the initial computer equipment. This amount represented the difference between the amount paid by Exxon for the initial computer equipment ($3,100,043) and the amount paid by NCR ($3,146,430), and it compensated Exxon for costs incurred as a result of a delay in completing the transaction.

The partnership paid for the initial computer equipment by wiring funds in the amount of $2,955,671.47 from Sun Life Insurance Co. of America (Sun Life), the partnership's lender, to IBM, and by issuing checks to IBM and NCR in the amounts of $144,371.53 and $230,979, respectively.

---

market value of the partnership's equipment at the time the appraisal was prepared was $3,710,000, and that it was reasonable to expect that in July of 1984, the equipment would have a value in excess of $745,000.

[5]The precise amount of the purchase credit does not appear in the record.

## Second Acquisition Stage

On September 1, 1977, NCR purchased the upgrade from IBM for $235,000 and sold it to the partnership for $258,672. The partnership paid for the upgrade by wiring funds from Sun Life to IBM in the amount of $230,005.21, and by issuing checks to IBM and NCR in the amounts of $4,994.79 and $23,672, respectively.

## Miscellaneous Costs

The partnership paid to Arlington Leasing, Inc. (Arlington), a wholly owned subsidiary of Integrated, a fee of $119,405 for services rendered by Arlington in connection with the acquisition of the initial computer equipment and the upgrade (the computer equipment). Arlington was an equipment leasing company that Integrated acquired in August of 1977, and it provided advice to Integrated and IR-Oak, the general partner of the partnership, on how to negotiate and close equipment leasing transactions. The partnership treated the fee as an acquisition cost and included it in its cost basis of the computer equipment.[6]

The partnership also paid (a) selling commissions in the aggregate amount of $29,995.68 to Kelley & Morey, Inc. (Kelly & Morey), a wholly owned subsidiary of Integrated, for services in connection with selling limited partnership interests in the partnership; (b) interim interest in the amount of $1,518.89 to Manufacturers Hanover Trust Co. for a short term loan; and (c) a fee of $10,000 to a law firm for tax advice.

## The Partnership's Financing of the Computer Equipment

Pursuant to a security and loan agreement dated June 15, 1977 (the loan agreement), the partnership obtained from Sun Life a loan in the principal amount of $2,955,671.47 (the initial loan) for the purpose of financing its purchase of the initial computer equipment. The partnership evidenced its obligation to repay the initial loan by executing and delivering to Sun Life a promissory note, dated July 29,

---

[6]The partnership reported on its Federal income tax returns (Forms 1065) a total cost basis for the computer equipment of $3,709,099, consisting of the purchase price of $3,589,694 plus the $119,405 fee paid to Arlington.

1977 (the partnership note). The principal amount of the initial loan together with interest at a rate of 9.25 percent per annum was repayable by the partnership in 83 consecutive monthly installments, commencing on September 1, 1977, in the amount of $51,524.79 for the first 35 months and $45,157 for the subsequent 48 months. Section 5 of the loan agreement provided that the partnership was personally liable for the repayment of $975,000 of the initial loan.[7]

To provide financing for its purchase of the upgrade, the partnership borrowed from Sun Life an additional amount of $230,005.21 (the additional loan). The partnership and Sun Life amended the loan agreement to reflect the additional loan. The partnership evidenced its obligation to repay the additional loan by executing and delivering to Sun Life a promissory note dated September 1, 1977 (the upgrade note). Payments on the upgrade note commenced on October 1, 1977. The amendment to the security and loan agreement and the upgrade note provided that the partnership was personally liable for the repayment of $55,000 of the additional loan.

The aggregate principal amount of the initial loan and the additional loan (the loans) in the amount of $3,185,676.68 was repayable in accordance with the loan agreement, as amended. After the partnership's initial installment payment on September 1, 1977, of $51,524.79, the loans were repayable by the partnership in 82 consecutive monthly installments of $55,403.79 for the first 34 months and $48,870 for the subsequent 48 months. According to the amendment to the security and loan agreement, the aggregate portion of the loans for which the partnership was personally liable was $1,030,000. Financing statements were filed reflecting the partnership as the owner of the computer equipment and the borrower on the Sun Life loans.

*The Partnership's Lease to NCR and NCR's Lease to Exxon*

On July 29, 1977, the partnership leased the initial computer equipment to NCR for a term of 84 months (the computer lease). On September 1, 1977, the partnership leased the upgrade to NCR, pursuant to an amendment to

---

[7]See Appendix B at page 1508.

the computer lease, for the remaining term of the computer lease.

The computer lease was a net lease, which required NCR to maintain the computer equipment, keep it insured, and pay all fees and taxes with respect to the computer equipment. NCR had no right to terminate the computer lease, no option or obligation to purchase or re-lease the computer equipment at the expiration of the computer lease, and was required to deliver the computer equipment to the partnership at the expiration of the computer lease.

The rent payable by NCR to the partnership under the computer lease, as amended, was as follows: interim rent in the amount of $3,440.32 for the period from the commencement of the computer lease through July 30, 1977; monthly installments of $51,604.79 payable on August 1, 1977, and September 1, 1977; and (following the addition of the upgrade to the computer lease) $55,575.79 payable on the first day of each month in advance commencing on October 1, 1977, for the first 35 months and $48,965 for the subsequent 48 months. These amounts were sufficient to enable the partnership to pay the debt service due under the loans (which would be fully paid off at the expiration of the computer lease), pay its expenses, and make small cash distributions to its partners during the term of the computer lease.

On July 29, 1977, NCR subleased the initial computer equipment to Exxon for a term of 84 months (the Exxon lease). On September 1, 1977, NCR subleased the upgrade to Exxon pursuant to an amendment to the Exxon lease. Exxon had the right to terminate the Exxon lease at the expiration of the 36th month or at any time thereafter. The Exxon lease also was a net lease.

The rent payable by Exxon to NCR under the Exxon lease, as amended, was as follows: interim rent in the amount of $4,202 for the period from the commencement of the Exxon lease through July 30, 1977; $63,030 payable on August 1, 1977, and September 1, 1977; $3,894 payable as interim rent for the period from the addition of the upgrade to the Exxon lease through September 30, 1977; $67,894 payable on the first day of each month, in advance,

commencing on October 1, 1977, for 35 months and $52,548 for the subsequent 48 months.

On July 29, 1977, with Exxon's consent, NCR assigned to the partnership, as collateral security for NCR's obligations to the partnership under the computer lease, NCR's right, title, and interest (but none of its obligations) as lessor in the Exxon lease.[8] The assignment and consent were amended on September 1, 1977, to reflect the acquisition and lease of the upgrade.

To further secure its rental payment obligations under the computer lease, NCR agreed to set aside, in an escrow account, $11,425.21 per month out of the Exxon lease payments it was due for the initial 36 months of the computer lease. The escrow agreement was amended on September 1, 1977, to reflect the addition of the upgrade to the computer lease and the Exxon lease, and the set-aside amount was increased to $12,395.21.

NCR also purchased for itself a computer lease indemnity policy from Lloyd's of London, dated September 1, 1977, and attaching May 1, 1977, which named NCR, but not the partnership or petitioner, as the insured, and Sun Life as an additional insured. The amount insured was $1,880,256 (following an increase of $143,155 as a result of the lease of the upgrade), which amount approximated 80 percent of NCR's remaining rental obligation to the partnership after the initial 36 months of the computer lease. Under the terms of the policy, Lloyd's of London agreed to pay up to 80 percent of NCR's obligation under the computer lease if Exxon terminated the Exxon lease on or after August 1, 1980. NCR paid approximately $40,000 for this insurance.

On January 31, 1980, Exxon elected to terminate the Exxon lease. Exxon and NCR thereupon negotiated an extension of the Exxon lease for an additional 18 months at a reduced rental.

In March of 1983, NCR discontinued making rental payments under the computer lease and was, and as of the date of trial continued to be, in default thereunder. As a result, in 1983, Lloyd's of London paid $775,863 to Sun Life in accordance with the computer lease indemnity policy referred to above.

---

[8]Exxon also agreed to make all payments due under the Exxon lease directly to Sun Life.

## The Partnership's Initial Sources and Uses of Funds in 1977

The partnership's initial sources and uses of funds in 1977 were as follows:

*Sources of funds*

| | | |
|---|---|---|
| Capital contributions. | | $506,000 |
|    Contributions of the general partners | $5,566 | |
|    Contributions of the initial limited partner | 506 | |
|    Contributions of the investor limited partners | 499,928 | |
| Loans | | 3,185,676 |
|    Recourse portion | $1,030,000 | |
|    Nonrecourse portion | 2,155,676 | |
| Advance rental payment from NCR | | 55,498 |
| Interim rental payment from NCR | | 3,440 |
|    Total | | 3,750,614 |

*Uses of funds*

| | | |
|---|---|---|
| Acquisition of computer equipment | | 3,589,694 |
|    Initial computer equipment | $3,331,022 | |
|    Upgrade | 258,672 | |
| Acquisition fee | | 119,405 |
| Selling commissions | | 29,996 |
| Interim interest | | 1,519 |
| Fee for tax advice | | 10,000 |
|    Total | | 3,750,614 |

## The Remarketing Agreement

To provide for the sale or re-lease of the computer equipment at the expiration of the computer lease, the partnership entered into a remarketing agreement with ACSL dated September 1, 1977, appointing ACSL as the partnership's exclusive agent for remarketing the computer equipment. Under the terms of this agreement, ACSL was obligated to exercise its best efforts to sell or re-lease the computer equipment on behalf of the partnership.

ACSL had 180 days to sell or re-lease the computer equipment, or demonstrate satisfactory prospects for selling or re-leasing the computer equipment, in order to retain its exclusive agency with the partnership. If the computer equipment was remarketed after the 180-day period by a party other than ACSL, ACSL would not have been entitled to any compensation.

ACSL had no authority to bind or otherwise obligate the partnership to any sale, lease, or other disposition of the computer equipment. In the event of a sale, re-lease, or other disposition of the computer equipment under the remarketing agreement, all of the proceeds were first to be distributed to the partnership until the partnership received an amount equal to 16 percent of the partnership's initial cost of acquiring the computer equipment from NCR, and any amount in excess of this amount was to be distributed 50 percent to the partnership, 25 percent to ACSL, and 25 percent to Arlington.

## Residual Value

The partnership's computer equipment had virtually no moving parts that wear with age; instead, it was composed of electronic integrated circuits that frequently improve as they are used. As a result, the value of such equipment depends not on its physical age but on technological advancements. As new, more advanced computer equipment is introduced, the market gradually loses interest in older equipment. Eventually, only a few users are interested in the older equipment even at very low prices.

During the years in question, the primary factor that influenced prices for used IBM computer equipment was IBM's own new products. IBM announcements about new products or price changes usually had an immediate impact on the market values of used IBM computers.

In the early 1960's, IBM introduced the IBM 360 series of computers. This product line was a dramatic departure from its previous computers in that it combined into a single family what had been previously a conglomeration of several different models. The 360 series was so popular that IBM felt no need to introduce its next generation of computers, the 370 series, until 1971.

The 360 series was not without disadvantages, however. Extraordinary efforts were required to convert a computer user's operations to the 360 series. This in turn made it possible for competitors of IBM to wage strong, but largely unsuccessful, campaigns to persuade computer users to abandon IBM products. While the 360 series offered clear

advantages over earlier generations of equipment, IBM and computer users discovered that converting from one computer system to a vastly different one was a difficult and costly task.

In 1971, IBM introduced the first models of the 370 series of computers, which offered only modest improvements over the 360 series. The IBM System 370 Model 168, the same model that was acquired and leased by the partnership, was announced in 1972 as the successor to an earlier model of the 370 series and was first installed in the summer of 1973. It was a high-end virtual storage machine that provided cost savings and operational advantages over its predecessor and became popular with very large advanced users.

In the early 1970's, it became generally known that IBM intended to develop and implement a new "Future System" (FS) of computer equipment. FS was expected to be another dramatic departure from earlier IBM families of computers, in the same way that the 360 series had been. By 1975, however, it became clear that IBM had abandoned FS, and in October of 1976, IBM publicly announced that future changes in its products would be "evolutionary" rather than "revolutionary." The demise of FS had the effect of increasing the market values of used IBM products in 1975 and 1976.

In January of 1979, IBM announced the 4300 series of computers. The 4300 series was much less expensive than its predecessors, offered dramatically superior performance, and was completely unexpected by the industry. As a result, it had a devastating effect on the residual values of earlier IBM computers, including the System 370 Model 168.

The partnership's income, expenses, and net loss for the years 1977-83 were reported on its Federal income tax returns (Forms 1065) as follows:

|  | 1977 | 1978 | 1979 |
|---|---|---|---|
| Gross rental income | $277,040 | $665,986 | $665,985 |
| Interest income | 9,552 | 16,567 | 7,629 |
| Depreciation | (569,729) | (963,193) | (672,120) |
| Interest expense | (129,749) | (280,229) | (232,567) |
| Other expense | (10,017) | (500) | (502) |
| Net gain or (loss) | (422,903) | (561,369) | (231,575) |

|                      | 1980        | 1981       | 1982       | 1983       |
|----------------------|-------------|------------|------------|------------|
| Gross rental income  | $633,317    | $587,580   | $587,580   | $873,793   |
| Interest income      | 2,482       | 148        | 67         | - - -      |
| Depreciation         | (610,636)   | (610,636)  | (308,537)  | (6,438)    |
| Interest expense     | (185,721)   | (143,333)  | (100,467)  | (6,309)    |
| Other expense        | (750)       | (4,597)    | (1,015)    | (8,977)    |
| Net gain or (loss)   | (161,308)   | (170,838)  | 177,628    | 852,069    |

|                              | 1977-1983    |
|------------------------------|--------------|
| Cumulative net gain or (loss) | ($518,296)   |

Petitioner reported and deducted her distributive share of partnership losses and interest expenses for the years in question on her corresponding Federal income tax returns. In his notice of deficiency, respondent disallowed these deductions, stating that "it has not been established that any deductible loss was sustained by the partnership during the taxable year."

## Ultimate Findings of Fact

The partnership purchased and leased the computer equipment with the predominant purpose and intention of making a profit. The partnership's transactions were motivated by business purpose and were bona fide arm's-length transactions at fair market value from which the partnership could reasonably have expected to derive an economic profit exclusive of tax benefits.

### OPINION

We must decide whether petitioner is entitled to deduct her distributive share of partnership losses and interest expenses for the years in question. Petitioner bears the burden of proof with respect to the original deficiencies, and respondent bears the burden of proof with respect to the increased deficiencies in the amended answer. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Reiff v. Commissioner*, 77 T.C. 1169, 1173 (1981).

Respondent's basic position in this case is that the partnership's ownership of the computer equipment should be disregarded for tax purposes because the computer

leasing transaction was a tax-avoidance scheme totally lacking in economic substance. In support of this position, respondent argues that the partnership never acquired the benefits and burdens of owning the computer equipment, the partnership never had an equity investment in the computer equipment, the partnership's purchase and lease of the computer equipment were not motivated by a valid business purpose and did not offer petitioners any potential for economic profit, and the partnership's transactions do not satisfy the tests of substance established by the Supreme Court in *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978). Respondent also argues that the partnership never was engaged in any activity for profit within the meaning of section 183, that petitioner never obtained a basis in her partnership interest that was greater than her cash contribution to the partnership, and that petitioner never was "at risk" within the meaning of section 465 for any amount in excess of her cash contribution to the partnership.[9]

Petitioner contends that the partnership's transactions should be recognized for tax purposes and that the partnership is entitled to all of the tax benefits afforded the owner of the computer equipment. She argues that the partnership's purchase and lease of the computer equipment were motivated by business purpose and supported by economic substance, that the partnership acquired the benefits and burdens of owning the computer equipment, and that the partnership had an equity investment in the computer equipment. Petitioner also asserts that she was entitled to include in her basis in her partnership interest her allocable share (4.94 percent) of the partnership's recourse and nonrecourse liabilities and that she was at risk within the meaning of section 465 for an amount sufficient to permit her to deduct her distributive share of partnership losses and interest expenses for each of the years in question. For the reasons set forth below, we find for petitioner.

---

[9]Respondent also appears to question whether the partnership properly elected the half-year convention for depreciation, and he asserts that there is no indication in the record that the partnership kept the required records to allow for any depreciation prior to Dec. 29, 1977. The record discloses, however, that the partnership properly adopted the half-year convention on Form 4832 of its 1977 Partnership Return of Income (Form 1065), and that the partnership maintained complete documentation of its purchase and lease of the computer equipment.

## Economic Substance

The fact that a transaction generates tax benefits for investors does not necessarily mean that the transaction lacks economic substance. *Frank Lyon Co. v. United States*, 435 U.S. 561, 581 (1978); *Mukerji v. Commissioner*, 87 T.C. 926, 958 (1986); *Estate of Thomas v. Commissioner*, 84 T.C. 412, 432 (1985). However, where a transaction is entered into without any purpose other than to obtain tax benefits, the form of the transaction will be disregarded and the tax benefits will be denied. *Law v. Commissioner*, 86 T.C. 1065, 1093 (1986); *Estate of Thomas v. Commissioner*, *supra* at 432-433. A transaction has economic substance and will be recognized for tax purposes if the transaction offers a reasonable opportunity for economic profit, that is, profit exclusive of tax benefits. *Estate of Thomas v. Commissioner*, *supra* at 438; *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184, 203 n. 17 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985). We conclude that the partnership's purchase and lease of the computer equipment were supported by economic substance because the record in this case establishes that the partnership's transactions offered a reasonable opportunity for economic profit.

In July of 1977, the executives of Integrated, NCR, and ACSL who negotiated the partnership's transactions were familiar with computer equipment and computer leasing transactions. They also were familiar with the history of the computer industry and with projections of residual values of computer equipment, and they were aware that Lloyd's of London was willing to insure residual values of computer equipment in computer leasing transactions for a relatively small fee. As a result of their knowledge and experience, they believed in 1977 that the partnership's computer equipment would have a residual value in 1984 at the expiration of the computer lease in excess of 20 percent of the equipment's cost. They confirmed their belief by obtaining in 1977 an independent appraisal of the partnership's computer equipment that indicated that it would be reasonable to expect that the computer equipment would have a residual value in 1984 in excess of $745,000.

We find that in 1977, it was reasonable to believe that the partnership's computer equipment would have a residual

value in 1984 in excess of 20 percent of its cost. The demise of IBM's "Future System" encouraged many to believe that IBM's new products would be compatible with the 370 series, and that the 370 series would therefore retain substantial residual value. Indeed, in October of 1976, IBM publicly announced that future changes in its product line would be "evolutionary" rather than "revolutionary." Moreover, the 360 series had in fact retained substantial residual value despite the introduction of the 370 series in 1971, and in 1977, 360 series computers were selling, in some cases, at prices as high as 25 percent of cost and were generating rental revenue as high as 40 percent of their original rent.

The fact that Lloyd's of London was willing, in effect, to guarantee the residual value of the partnership's computer equipment in July of 1977, for a relatively small premium, is strong evidence that it was not unreasonable to believe in July of 1977 that the partnership's computer equipment would have substantial residual value at the expiration of the computer lease in 1984.[10] The fact that the partner-

---

[10] All but one of the experts who testified in this case concluded that in 1977 it would have been reasonable to believe that the partnership's computer equipment would have substantial residual value in 1984. Harvey Berlent, the president of Berlent Industries, Inc., a company involved in the purchase, sale, lease, and appraisal of computer equipment, testified for petitioner and concluded that in 1977, it would have been reasonable to assume that the partnership's computer equipment would have a value in 1984 in excess of 20 percent of the equipment's cost. Mr. Berlent prepared the appraisal of the partnership's computer equipment in 1977 and predicted in that appraisal that in 1984 the computer equipment would have a residual value in excess of $745,000.

Esmond Lyons, the director of the western regional office of SRI International (formerly known as the Stanford Research Institute), a not-for-profit corporation involved in technology research and management consulting, also testified for petitioner and concluded that in 1977 it would have been reasonable to believe that in 1984 the partnership's computer equipment would have a value in excess of 20 percent of its cost.

Frederic Withington, a vice president of Arthur D. Little, Inc., a consulting firm based in Cambridge, Massachusetts, testified for respondent and concluded, based on a report that he prepared in August of 1977, that he would have predicted in 1977 that the partnership's computer equipment would have a value in 1984 of between $275,000 and $549,000.

Only Dee Morgan, an expert witness for respondent and a former employee of the General Services Administration, testified that in 1977, she would have predicted that in 1984 the partnership's computer equipment would have no value. While Ms. Morgan's prediction, if she had made it in 1977, would have turned out to be correct, we note that she did not make her prediction in 1977, and that the only two experts who actually made predictions in 1977, Frederic Withington and Harvey Berlent, both predicted *in 1977* that the partnership's computer equipment (or equipment similar to it) would have substantial residual value in 1984.

In any event, the question is not who was correct in predicting the actual residual value of the computer equipment in 1984; rather, the question is what was reasonable to believe in 1977 with respect to what the residual value of the computer equipment would be in 1984. We are satisfied that the evidence in the record as a whole establishes that in 1977 it was reasonable to believe that the partnership's computer equipment would have a value in 1984 in excess of 20 percent of the equipment's cost.

ship's computer equipment ultimately had no value in 1984, due to unexpected actions by IBM in January of 1979, does not affect the reasonableness of predictions made and beliefs held in the summer of 1977. Tax consequences cannot depend on unrealistic demands for certainty. If the computer equipment had retained a residual value in 1984 of 20 percent of the equipment's cost, the partnership would have realized a pre-tax profit on its $506,000 investment of $140,145 plus $4,370 in projected cash-flow.[11] Because we conclude that in 1977 there was a reasonable possibility that the computer equipment would have a residual value in 1984 in excess of 20 percent of its cost, it follows that there was a reasonable possibility that the partnership's purchase and lease of the computer equipment would return a pre-tax profit in excess of $144,515. This potential for profit constitutes the requisite economic substance. See *James v. Commissioner*, 87 T.C. 905, 924 (1986); *Estate of Thomas v. Commissioner, supra* at 437; *Rice's Toyota World, Inc. v. Commissioner, supra* at 203 n. 17.

Respondent's argument that the partnership never acquired the benefits and burdens of owning the computer equipment is without merit. The partnership acquired the most significant benefit and burden of owning the computer equipment, namely, the potential of realizing a profit or loss on the sale or re-lease of the computer equipment. See *Estate of Thomas v. Commissioner, supra* at 434; *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1238 (1981). Moreover, the partnership was personally liable under the security and loan agreement for a significant portion of the notes to Sun Life. The fact that the balance of the partnership's debt was nonrecourse and that the rental payments under the computer lease were just slightly more than the partnership's debt service are merely neutral

---

[11] $3,589,694 (Price paid by partnership for computer equipment) × 20% =

| | |
|---|---:|
| $3,589,694 (Price paid by partnership for computer equipment) × 20% = | $717,939 |
| Plus cash-flow projected in confidential memorandum | 4,370 |
| Less broker's fee of 50% of amount in excess of 16% of computer equipment's cost (50% of $143,588 ($717,939 − $574,351)) | (71,794) |
| Less total amount invested by partnership | (506,000) |
| Total partnership profit | 144,515 |

factors in determining the substance of a leasing transaction. See *Dunlap v. Commissioner*, 74 T.C. 1377, 1435-1436 (1980), revd. on another issue 670 F.2d 785 (8th Cir. 1982); *Hilton v. Commissioner*, 74 T.C. 305, 348, 363 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982), cert. denied 459 U.S. 907 (1982). Moreover, we have long rejected any notion that a net lease, such as the computer lease in this case, shifts the burden of ownership from the lessor to the lessee. See *Estate of Thomas v. Commissioner, supra* at 433; *Hilton v. Commissioner, supra* at 348; *LTV Corp. v. Commissioner*, 63 T.C. 39, 49-50 (1974).

There also is no basis for concluding that the partnership did not have an equity investment in the computer equipment. The partnership acquired the computer equipment for a price equal to its fair market value at the time of purchase,[12] and the indebtedness to which the computer equipment was subject was less than the computer equipment's fair market value.[13] The partnership therefore had an equity investment in the computer equipment that it

---

[12]One expert witness testified for respondent that the fair market value of the computer equipment on July 28, 1977, was $3 million. Respondent's other expert witness testified that the fair market value of the computer equipment in August of 1977 was $3,109,742. We find neither of these estimates to be reliable.

Exxon purchased the initial computer equipment from IBM, *with purchase credits*, for $3,100,043 on July 29, 1977, and NCR purchased the Upgrade from IBM for $235,000 on Sept. 1, 1977. These were arm's-length transactions between unrelated parties.

"[W]hen a property is purchased as a result of good-faith arm's-length bargaining between unrelated parties, with neither buyer nor seller being under any compulsion and there being no special circumstances present, the purchase price will in general reflect the value of the article purchased at the time of purchase." [*Abramson v. Commissioner*, 86 T.C. 360, 372 (1986).]

Accordingly, we find that the fair market value of the computer equipment, without purchase credits, was *more than* $3,335,043 ($3,100,043 plus $235,000) in the summer of 1977. Moreover, because the partnership's purchase of the computer equipment from NCR was also an arm's-length transaction between unrelated parties, and the partnership's purchase price did not involve any purchase credits, we find that the fair market value of the computer equipment in the summer of 1977, without purchase credits, was the price the partnership paid for it, $3,589,694.

, The partnership reported on its Federal income tax returns (Forms 1065) a total cost basis for the computer equipment of $3,709,099, consisting of the purchase price of $3,589,694 plus a fee of $119,405 paid to Arlington Leasing, Inc., for services rendered in connection with the acquisition of the computer equipment. Respondent does not argue that the amount of the fee paid to Arlington was unreasonable or that it was improper to include the fee as part of the cost basis of the computer equipment.

[13]The fair market value of the computer equipment at the time the partnership acquired it was $3,589,694, the price the partnership paid for it. See note 12 *supra*. The total amount of the indebtedness to which the computer equipment was subject was $3,185,676.68. Of this amount, $1,030,000 was recourse indebtedness and $2,155,676.68 was nonrecourse indebtedness. See Appendix B at pages 1508-1509.

could not prudently abandon,[14] and the partnership's indebtedness was genuine. See *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1048 (9th Cir. 1976), affg. 64 T.C. 752 (1975); *Narver v. Commissioner*, 75 T.C. 53, 98-99 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982).[15]

Moreover, while it is true that the partnership's transactions offered investors tax savings in early years, in later years the depreciation and interest deductions were projected to be less than the income from the computer lease, and investors therefore would have to pay tax on the partnership's income. As a result, the projected net tax savings over the life of the partnership for a 70-percent taxpayer who invested $49,993 in the partnership (the amount necessary to purchase one limited partnership unit) were only $37,898.[16] We conclude from this that an investor could not have invested in the partnership solely for tax benefits.

We finally note that the form of the partnership's transactions matched their substance. The transactions entered into by the partnership were fully documented. The partnership was treated consistently as the owner of the computer equipment, as noted in the bills of sale from NCR, the security and loan agreement with Sun Life, the com-

---

[14]The partnership also had no incentive to abandon the computer equipment because it was personally liable to Sun Life for $1,030,000, and NCR was unconditionally obligated by the computer lease to make rental payments to the partnership during the computer lease in amounts sufficient to amortize the partnership's indebtedness to Sun Life.

[15]Respondent's contention that the partnership's indebtedness to Sun Life "was an illusion" and too contingent to be considered genuine finds no support in the record. The partnership and Sun Life entered into a security and loan agreement and the partnership executed promissory notes evidencing its indebtedness to Sun Life. Sun Life wired funds aggregating more than $3 million to IBM at the direction of the partnership. Moreover, the partnership was responsible for the monthly payments on its indebtedness to Sun Life regardless whether the lessees paid their monthly rent or defaulted.

While it is true that Sun Life's loans were secured by Exxon's financial status, Sun Life's security interest in the computer equipment, and the Lloyd's of London insurance policy, this does not mean that the partnership's indebtedness to Sun Life was illusory or too contingent to be considered genuine. In leasing transactions, prudent businessmen will always seek lessees that are financially strong, and prudent lenders will always seek, if the risk inherent in the transaction demands it, a security interest in the property that is acquired with the borrowed funds. Moreover, the protection afforded to NCR (and arguably to the partnership) by the Lloyd's insurance policy was no different from the protection afforded to NCR by subleasing the computer equipment to a financially strong lessee such as Exxon.

Respondent would apparently have us hold that the indebtedness incurred by a lessor in a leasing transaction is genuine only if the lessee is financially weak and the lender does not have a security interest in the property that is acquired with the lender's funds. We decline to do so.

[16]See Schedule B in Appendix A at pages 1506-1507.

puter lease with NCR, and the remarketing agreement with ACSL. The parties to these transactions did not create transactional documents for the sole purpose of supporting claimed tax benefits. The negotiations over the documents centered on legitimate business and economic factors and sometimes went late into the night. Legal opinions 'were obtained to assure the parties that the agreements were legal and enforceable under applicable non-tax laws. Financing statements were filed reflecting the partnership as the owner of the computer equipment and the borrower on the Sun Life loan. Nothing in the record suggests that the partnership did not view its rights and obligations as real, and nothing suggests that the partnership merely "papered" a solely tax-motivated transaction. See *Falsetti v. Commissioner*, 85 T.C. 332, 347 (1985).

In *Frank Lyon Co. v. United States*, 435 U.S. 561, 583-584 (1978), the Supreme Court held that—

where * * * there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties.

We hold that the partnership's transactions were genuine multiple-party transactions with economic substance that were encouraged by business realities, imbued with tax-independent considerations, and not shaped solely by tax-avoidance features with meaningless labels attached. Accordingly, the form of the partnership's transactions must be respected, and the partnership is entitled to all of the tax benefits afforded an owner of the computer equipment.

### Activity for Profit

Respondent argues, however, that the partnership never was engaged in an activity for profit within the meaning of section 183. We disagree.

Section 183(a) provides the general rule that where an individual is engaged in an activity, and "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(b)(1) provides that

deductions which would be allowable without regard to whether such activity is engaged in for profit shall be allowed, and section 183(b)(2) provides that deductions, which would be allowable only if such activity were engaged in for profit shall be allowed "only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)."

In determining whether an investment by an individual in a limited partnership constitutes an activity for profit within the meaning of section 183, the issue must be determined at the partnership level on the basis of the activities of the partnership. *Hager v. Commissioner*, 76 T.C. 759, 781-783 (1981); see *Brannen v. Commissioner*, 78 T.C. 471, 501-505 (1982), affd. 722 F.2d 695 (11th Cir. 1984).[17] Thus, if a limited partnership is engaged in an activity for profit within the meaning of section 183, its limited partners are likewise engaged in an activity for profit, and deductions attributable to their investment in the partnership are not subject to the limitations of section 183.

Section 183(c) defines an activity not engaged in for profit as follows:

SEC. 183(c). ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.—For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.

The question then is whether the partnership was engaged in an activity during the years in question that constituted a trade or business so that expenses incurred in connection with the activity were deductible under section 162.[18]

---

[17]"This does not mean, however, that our inquiry is confined solely to the activities of the partnership, for those parties possessing resources sufficient to acquire and exploit investment property are not always blessed with corresponding expertise. In such case, a partnership can rely upon the expertise of third parties * * *. The scope of the relevant inquiry therefore expands to encompass the entirety of such multilayered transactions." *Flowers v. Commissioner*, 80 T.C. 914, 932 (1983).

[18]Petitioner does not argue that the partnership was engaged in an activity for the production of income under sec. 212. Since the partnership's deductions were taken as expenses incurred in a trade or business, and petitioner did not claim the deductions on her tax returns under sec. 212, we treat the question whether the partnership was engaged in an activity for profit as arising under sec. 162. See *Flowers v. Commissioner, supra* at 931 n. 23.

An activity is a trade or business for purposes of section 162 if it is carried on with the predominant purpose and intention of making a profit. *Abramson v. Commissioner*, 86 T.C. 360, 370 (1986); *Flowers v. Commissioner*, 80 T.C. 914, 931 (1983); *Siegel v. Commissioner*, 78 T.C. 659, 698 (1982). The expectation of profit need not be a reasonable one, but there must be a bona fide objective of realizing a profit. *Allen v. Commissioner*, 72 T.C. 28, 33 (1979). The issue of whether there is an intention to make a profit is one of fact to be resolved on the basis of all the facts and circumstances of the case, and the burden of proving the requisite intention is upon petitioner. *Abramson v. Commissioner, supra* at 370; *Flowers v. Commissioner, supra* at 931-932. Some of the factors that may be helpful in determining whether an activity is engaged in for profit are set forth in the regulations.[19] These factors are not applicable to every case, however, and a careful review of the facts and circumstances of each case remains the primary test. *Abramson v. Commissioner, supra* at 371.

On the record before us, we have no difficulty in concluding that the partnership purchased and leased the computer equipment with the predominant purpose and intention of making a profit. The record establishes not only that it was reasonably possible that the partnership's activities would return a substantial pre-tax profit to the partnership, but that those who represented the partnership worked hard to ensure that the partnership would in fact realize that profit.

Goldsmith, acting on behalf of Integrated and later on behalf of the partnership, made a substantial effort to analyze the computer leasing industry and the transactions to be entered into by the partnership. He reviewed the internal historical and accounting records of NCR with McArdle to determine NCR's experience with its equipment portfolio. This analysis indicated that 12-year-old computer equipment was generating annual rent in 1977 equal to 25 percent of the equipment's original annual rent. Goldsmith also subscribed to, and obtained back issues of, a number of computer publications. He found the information contained in these publications useful in corroborating the data

---

[19] See sec. 1.183-2(b), Income Tax Regs.

provided by McArdle. After analyzing the data provided by NCR and the data available in the marketplace, Goldsmith believed that the partnership's purchase and lease of the computer equipment presented a reasonable potential for a significant profit.

Goldsmith also endeavored to negotiate the terms of the partnership's transactions to the partnership's best advantage. The terms were the subject of arm's-length negotiations between Goldsmith and Ault or McArdle. Substantial negotiations took place with respect to the purchase price of the computer equipment, the terms of the loan from Sun Life, and the remarketing agreement. Believing that the residual value of the computer equipment at the expiration of the computer lease would be at least 20 percent of the equipment's cost to the partnership, Goldsmith insisted that the partnership's initial share of any remarketing proceeds be raised from 11 percent to 16 percent of the computer equipment's original cost. Goldsmith also insisted that ACSL's right to remarket the computer equipment be limited in time to 180 days. Goldsmith's negotiations with Sun Life with respect to the security and loan agreement went far into the night. In sum, Goldsmith seriously evaluated the computer leasing industry and the profit to be made from the partnership's transactions, and he worked hard to obtain terms favorable to the partnership. Such facts demonstrate that Goldsmith, and therefore the partnership, were interested primarily in the business, non-tax aspects of the partnership's transactions.

Respondent asserts, however, that the projected tax benefits from the partnership's activities were far greater than any reasonable potential for profit and that such a disparity indicates that the partnership's activities were not engaged in for profit. We agree with respondent that a disparity between projected tax benefits and pre-tax profits is a factor to be considered in determining whether an activity is engaged in for profit within the meaning of section 183. See *Estate of Baron v. Commissioner*, 83 T.C. 542, 557-558 (1984), affd. 798 F.2d 65 (2d Cir. 1986). However, we disagree with respondent that the record establishes that such a disparity existed in this case. To the contrary, because the record establishes that the partner-

ship's activities presented a reasonable opportunity for very substantial pre-tax profits, a comparison of projected tax benefits with potential profits would further confirm that the partnership's activities were engaged in for profit.

We also reject respondent's suggestion that because the partnership and its partners could have made more money over the life of the partnership by investing in municipal bonds, the partnership's activities were not engaged in for profit. "[T]he availability of other investments which would yield a higher return, or which would be more likely to be profitable, is not evidence that an activity is not engaged in for profit." Sec. 1.183-2(b)(9), Income Tax Regs. It is not for us to second-guess investment decisions by taxpayers.

The record establishes that the partnership engaged in its activities with the predominant purpose and intention of making a profit. It follows that petitioner's deductions of her distributive share of partnership losses and interest expenses are not subject to the limitations of section 183.

*Basis*

Respondent also argues that petitioner's basis in her partnership interest is limited to her cash contribution to the partnership, and that petitioner therefore is limited to that extent in the amount of her distributive share she can deduct. Again, we disagree.

Section 752(a) provides:

> Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.

Section 722 provides that a contribution of money by a partner to the partnership increases the partner's basis in the partnership.

Section 752(c) provides:

> For purposes of this section, a liability to which property is subject shall, to the extent of the fair market value of such property, be considered as a liability of the owner of the property.

Section 1.752-1(e), Income Tax Regs., provides in part:

A partner's share of partnership liabilities shall be determined in accordance with his ratio for sharing losses under the partnership agreement. In the case of a limited partnership, a limited partner's share of partnership liabilities shall not exceed the difference between his actual contribution credited to him by the partnership and the total contribution which he is obligated to make under the limited partnership agreement. However, where none of the partners have any personal liability with respect to a partnership liability (as in the case of a mortgage on real estate acquired by the partnership without the assumption by the partnership or any of the partners of any liability on the mortgage), then all partners, including limited partners, shall be considered as sharing such liability under section 752(c) in the same proportion as they share the profits. * * *

Petitioner had a 4.94-percent interest in the capital, profits, and losses of the partnership at all relevant times since she became a partner in October of 1977. The partnership's indebtedness was genuine.[20] Petitioner assumed personal liability for her pro rata share (4.94 percent) of the partnership's recourse indebtedness pursuant to the limited partner guarantee, and she was obligated under the limited partnership agreement to make a special contribution to the partnership in an amount not greater than $50,882.[21] Moreover, under the terms of the limited partnership agreement, petitioner had no right to reimbursement from either the partnership or the general partners for amounts paid by her to the partnership as a special contribution or to Sun Life pursuant to the limited partner guarantee.[22] Petitioner was therefore not a mere guarantor of her pro rata share of the partnership's recourse indebted-

---

[20]See note 15 *supra* and accompanying text.

[21]Under the terms of the limited partner guarantee and the limited partnership agreement, petitioner was personally liable for the repayment of her pro rata share of the partnership's recourse indebtedness to Sun Life in two ways: first, if the partnership defaulted on its obligation to Sun Life, and if Sun Life brought an action against the partnership to enforce the obligation, petitioner would be required by the partnership, pursuant to sec. 5(c) of the limited partnership agreement, to make her special contribution to the partnership of up to $50,882 (which amount would then be applied by the partnership to the debt owed to Sun Life); in the alternative, if Sun Life chose not to proceed against the partnership for repayment of the debt, Sun Life could proceed directly against petitioner, pursuant to the terms of the limited partner guarantee, and require her to pay up to $50,882, her pro rata share (4.94 percent) of the partnership's recourse indebtedness.

[22]Sec. 6(f) of the limited partnership agreement expressly provided that limited partners had no right to withdraw or reduce their special contributions to the partnership once made, and sec. 7(d) of the limited partnership agreement provided that the general partners were not liable to the limited partners for any loss or liability incurred in connection with any matter, except for losses or liabilities attributable to the willful misconduct or gross negligence of a general partner.

ness, but was ultimately liable for it, because there was no primary obligor against whom she had a remedy to recover amounts paid by her to the partnership as a special contribution or to Sun Life pursuant to the limited partner guarantee. See *Abramson v. Commissioner*, 86 T.C. 360, 366 n. 10 (1986); *Smith v. Commissioner*, 84 T.C. 889, 908 (1985); *Brand v. Commissioner*, 81 T.C. 821, 828 (1983).

Under these circumstances, section 752 and section 1.752-1(e), Income Tax Regs., entitle petitioner to include in her basis in her partnership interest her allocable share (4.94 percent) of the partnership's recourse and nonrecourse liabilities.[23]

## At Risk Issue

Respondent's final contention is that petitioner was not "at risk" within the meaning of section 465 for any amount in excess of her cash contribution to the partnership during any of the years in question. In support of this contention, respondent argues that (1) under the limited partner guarantee, petitioner was a mere guarantor and not ultimately liable for her pro rata share of the partnership's recourse indebtedness, and (2) petitioner was protected against the loss of any amount in excess of her cash contribution to the partnership by the Lloyd's of London insurance policy and Exxon's strong credit rating.[24] For the reasons set forth below, we hold for petitioner on this issue.

Section 465(a) provides that in the case of certain taxpayers engaged in an activity to which section 465 applies, losses from the activity for a taxable year will be

---

[23]Respondent argues, however, that in *Brown v. Commissioner*, T.C. Memo. 1980-267, affd. without published opinion 698 F.2d 1228 (9th Cir. 1982), and *Block v. Commissioner*, T.C. Memo. 1980-554, we held that a direct assumption by a limited partner of partnership recourse indebtedness does not entitle the limited partner to increase his basis in his partnership interest. Those cases are distinguishable from this case, however, because neither of them involved, as this case does, a direct assumption by a limited partner of partnership recourse indebtedness coupled with an obligation under the partnership agreement to make additional capital contributions to the partnership.

[24]Respondent also cites some revenue rulings in a footnote in his brief and states simply that the rulings set forth his position regarding recourse notes convertible to nonrecourse notes. It is unclear why respondent cites these rulings. We note that on Jan. 1, 1982, petitioner's personal obligation with respect to the recourse portion of the partnership's indebtedness expired, and that respondent may be suggesting that because of this fact petitioner was not at risk during the years in question for her pro rata share of the partnership's recourse indebtedness. In the absence of such an assertion by respondent, however, we decline to consider this issue.

allowed up to the aggregate amount that the taxpayer is "at risk" for such activity at the close of such taxable year. Section 465(b)(1) provides that a taxpayer is at risk for money contributed to the activity, and section 465(b)(2) provides that a taxpayer is at risk for amounts borrowed for use in the activity to the extent that the taxpayer is personally liable for the repayment of such amounts. However, section 465(b)(4) provides that "a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." Petitioner concedes that section 465 applies to her investment in the partnership.

Petitioner entered into legally enforceable contracts that made her personally liable for her pro rata share of certain partnership indebtedness that was incurred and used by the partnership to acquire the computer equipment. These agreements consist of the limited partner guarantee and the limited partnership agreement, and they were executed by petitioner in October of 1977. Under the limited partner guarantee, petitioner assumed direct liability to Sun Life for her pro rata share of the partnership's recourse indebtedness, and she consented to be sued directly by Sun Life for the portion of the indebtedness she assumed, regardless whether Sun Life first proceeded against the partnership. In the event Sun Life proceeded against the partnership for the recourse indebtedness, however, petitioner was obligated under the limited partnership agreement to make a special contribution to the partnership in an amount sufficient to pay her pro rata share of the indebtedness, and she had no right to reimbursement for any amounts paid by her to Sun Life pursuant to the limited partner guarantee or to the partnership as a special contribution.[25] As a result, contrary to respondent's assertion, petitioner was not a mere guarantor of her pro rata portion of the partnership's recourse indebtedness, but was ultimately liable for it, because there was no primary obligor against whom she had a remedy to recover amounts paid by her to Sun Life pursuant to the limited partner guarantee or to the partnership as a special contribution. See *Abramson v. Commis-*

---

[25]See notes 21 & 22 *supra.*

*sioner, supra* at 366 n. 10; *Smith v. Commissioner, supra* at 908; *Brand v. Commissioner, supra* at 828. Petitioner was therefore at risk within the meaning of section 465 for the full amount of her pro rata share of the partnership's recourse indebtedness to Sun Life. See *Abramson v. Commissioner, supra* at 375-376.[26]

Respondent argues, however, that because Exxon was a strong credit risk and not likely to default on its lease obligations during the years in question, petitioner was protected against loss and was therefore not at risk within the meaning of section 465 for her pro rata share of the partnership's recourse indebtedness. We reject this argument because we perceive nothing in section 465 or its legislative history that requires an owner of property to enter into a transaction with a party that is a poor credit risk in order to be "at risk" within the meaning of section 465.

We also reject respondent's assertion that petitioner was protected against loss by the Lloyd's of London insurance policy. The insured period under the Lloyd's policy did not commence until August 1, 1980, and the policy therefore provided no protection against loss for anyone during the years in question.

Petitioner entered into legally enforceable contracts that made her personally and ultimately liable for her pro rata share of the partnership's recourse indebtedness to Sun Life. The partnership incurred its recourse indebtedness to Sun Life for the purpose of acquiring the computer equipment, and petitioner was not protected against loss with respect to her share of this indebtedness. Consequently, petitioner was at risk within the meaning of section 465 for

---

[26]"A limited partner who assumes personal liability on a loan to the partnership (made by a bank or other lender), but who obtains the general partner's agreement to indemnify him against some or all of any loss arising under such personal liability, is at risk only with respect to the excess of the amount of the indebtedness over the maximum amount covered by the indemnity agreement." S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 87 n. 5. It follows that a limited partner such as petitioner, who assumed personal liability on a loan to the partnership, which was made by a bank or other lender, and who had no agreement with anyone to indemnify her against any loss arising with respect to such liability, was at risk for the full amount of the indebtedness. Not only did petitioner not have an agreement with the general partners to indemnify her against loss arising under the limited partner guarantee, but, as already noted, the limited partnership agreement expressly provided that the general partners were not liable to the limited partners for any loss or liability incurred in connection with any matter, except for losses or liabilities attributable to the willful misconduct or gross negligence of a general partner.

her proportionate share ($50,882) of the partnership's recourse indebtedness to Sun Life.[27]

We hold that (1) the partnership's transactions were supported by economic substance; (2) the partnership's purchase and lease of the computer equipment were activities that were engaged in for profit; (3) petitioner was entitled to include in her partnership basis her pro rata share of the partnership's recourse and nonrecourse liabilities; and (4) petitioner was "at risk" within the meaning of section 465 for her pro rata share of the partnership's recourse indebtedness. It follows that petitioner is entitled to deduct her distributive share of partnership losses and interest expenses for the years in question.

*Decision will be entered under Rule 155.*

[27]As a result of petitioner's cash contribution to the partnership and her assumption of her pro rata share of the partnership's recourse indebtedness, petitioner was at risk in the partnership's leasing activity at the close of each of the taxable years in question for an amount sufficient to permit her to deduct all of the claimed losses and interest expenses.

| | Dec. 31— | | |
| --- | --- | --- | --- |
| | *1977* | *1978* | *1979* |
| Amount at risk | [1]$75,878.50 | [2]$54,986.50 | [2]$27,254.50 |
| Claimed losses and interest expenses | 20,892.00 | 27,732.00 | 11,121.00 |
| Excess amount at risk | 54,986.50 | 27,254.50 | 16,133.50 |

[1]Cash contribution of $24,996.50 plus proportionate share of recourse indebtedness, $50,882.
[2]Amount at risk as of end of immediately preceding taxable year, reduced by losses claimed by petitioners with respect to immediately preceding taxable year. See sec. 465(b)(5).

APPENDIX A

## DARTMOUTH ASSOCIATES
### SCHEDULE A

REMAINING LIMITED PARTNER'S CONTRIBUTION $499,928

Projections of taxable events are made for informational purposes only, and they have not been passed upon by counsel. The projections do not take into account the effect, if any, of the maximum tax, the minimum tax and the investment interest limitation on the particular circumstances of individual investors. They are based upon the assumptions, and are subject to the risks described in the accompanying memorandum, and must be viewed in light of such assumptions and risks (see particularly the discussions under "Federal Tax Consequences"). No representations or warranties are being made as to tax effect, depreciable lives, methods and allocations, or legal effect of the transaction.

| Year | (1) (A) Rental income | (2) (B) Debt service | (3) Interest expense | (4) Amortization | (5) (C) Depreciation | (6) (D) Expenses | (7) Taxable income (loss) | (8) Net cash flow[1] |
|---|---|---|---|---|---|---|---|---|
| 1977 | 277,041 | 274,656 | 120,196 | 154,460 | 569,729 | 10,000 | (422,884) | 365 |
| 1978 | 665,988 | 664,845 | 263,661 | 401,184 | 963,194 | 500 | (561,367) | 640 |
| 1979 | 665,988 | 664,845 | 224,938 | 439,907 | 665,683 | 500 | (225,133) | 640 |
| 1980 | 633,318 | 625,643 | 183,239 | 442,404 | 604,197 | 500 | (154,619) | 640 |
| 1981 | 587,580 | 586,440 | 143,185 | 443,255 | 604,197 | 500 | (160,303) | 640 |
| 1982 | 587,580 | 586,440 | 100,400 | 486,040 | 302,099 | 500 | 184,580 | 640 |
| 1983 | 587,580 | 586,440 | 53,485 | 532,955 | | 500 | 533,595 | 640 |
| 1984[2] | 342,755 | 293,222 | 7,751 | 285,471 | | 500 | 334,504 | 165 |
| Total | 4,347,830 | 4,282,581 | 1,096,855 | 3,185,676 | 3,709,099 | 13,500 | (471,627) | 4,370 |

The amounts in columns (1) - (8) include the general partners' 1.1% allocation and the initial limited partner's .1% allocation for which respective capital contributions of $5,566 and $506 will be made.

[1]The "Net cash-flow" reflects estimated administrative expenses to the partnership of $500 per annum.

[2]1984 projections do not take into account the effect of the residual value of the equipment upon release or sale at the expiration of the lease.

September 21, 1977

APPENDIX A
(continued)

## DARTMOUTH ASSOCIATES
## SCHEDULE B

LIMITED PARTNER'S CONTRIBUTION   $49,993

Projections of taxable events are made for informational purposes only, and they have not been passed upon by counsel. The projections do not take into account the effect, if any, of the maximum tax, the minimum tax and the investment interest limitation on the particular circumstances of individual investors. They are based upon the assumptions, and are subject to the risks described in the accompanying memorandum, and must be viewed in light of such assumptions and risks (see particularly the discussions under "Federal Tax Consequences"). No representations or warranties are being made as to tax effect, depreciable lives, methods and allocations, or legal effect of the transaction.

| Year | (1) Purchase installment | (2) Interest | (3)(A) Annual cash outlay | (4)(B) Annual taxable profit (loss) | (5)(C) Annual cash distribution | (6)(D) Annual benefit | After tax cash benefit 70% bracket (7)(E) Net net benefit | (8)(F) Net cumulative | (9)(D) Annual benefit | After tax cash benefit 60% bracket (10)(E) Net net benefit | (11)(F) Net cumulative | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1977 | 10,640 | | 10,640 | (41,781) | 36 | 29,283 | 18,643 | 18,643 | 25,105 | 14,465 | 14,465 | 1977 |
| 1978 | 21,270 | 2,755 | 24,025 | (68,218) | 63 | 40,816 | 16,791 | 35,434 | 34,994 | 10,969 | 25,434 | 1978 |
| 1979 | 10,110 | 1,266 | 11,376 | (23,509) | 63 | 16,519 | 5,143 | 40,577 | 14,168 | 2,792 | 28,226 | 1979 |
| 1980 | 7,973 | 558 | 8,531 | (15,834) | 63 | 11,147 | 2,616 | 43,193 | 9,563 | 1,032 | 29,258 | 1980 |
| 1981 | | | | (15,838) | 63 | 11,150 | 11,150 | 53,343 | 9,566 | 9,566 | 38,824 | 1981 |
| 1982 | | | | 18,237 | 63 | (12,703) | (12,703) | 41,640 | (10,879) | (10,879) | 27,945 | 1982 |
| 1983 | | | | 52,719 | 63 | (36,840) | (36,840) | 4,800 | (31,568) | (31,568) | (3,623) | 1983 |
| *Residual value (G)* | | | | | | | | | | | | |
| 1984 (0)% | | | | 30,085 | 16 | (21,044) | (21,044) | (16,244) | (18,035) | (18,035) | (21,658) | |
| 1984 (10) - $358,969 | | | | 65,552 | 35,482 | (10,404) | (10,404) | (5,604) | (3,849) | (3,849) | (7,472) | |
| 1984 (16) - 574,351 | | | | 86,831 | 56,762 | (4,020) | (4,020) | 780 | 4,663 | 4,663 | 1,040 | |
| 1984 (25) - 735,887 | | | | 102,791 | 72,722 | 768 | 768 | 5,568 | 11,047 | 11,047 | 7,424 | |
| 1984 (30) - 825,630 | | | | 111,658 | 81,589 | 3,428 | 3,428 | 8,228 | 14,594 | 14,594 | 10,971 | |
| 1984 (40) - 1,005,114 | | | | 129,391 | 99,322 | 8,748 | 8,748 | 13,548 | 21,687 | 21,687 | 18,064 | |

September 21, 1977

*Notes*

(A) The 1977 installment in column (1) is payable in cash upon subscription to a unit of the partnership. The remaining installments represent payments in satisfaction of limited partners' notes secured by letter of credit. Column (2) is calculated at 7% per annum on the unpaid portion of the limited partners' notes. The installment payments and interest thereon are payable annually. Column (3) equals the sum of limited partners' installment payments (column 1) and interest thereon (column 2).

(B) Column (4) equals a one unit limited partner's 9.88% share of "taxable profit (loss)" of the partnership and interest thereon (column 2).

(C) Column 5 represents annual net cash-flow from operations available for distribution applicable to a one unit share.

(D) Column 6 equals the sum of 70% of "Annual taxable profit (loss)" (column 4) and "Annual cash distribution" (column 5). Column (9) equals the sum of 60% of "Annual taxable profit (loss)" column (4) and "Annual cash distribution" (column 5).

(E) Columns (7 and 10) equal "Annual benefit" (column 6 or 9) less "annual cash outlay" (column 3).

(F) Columns (8 and 11) are the cumulative sums of column (7 or 10) respectively.

(G) The alternative figures for 1984 assume a sale of all of the equipment for different amounts constituting different percentages of the original purchase price.

*Represents a one unit (9.88%) limited partner's share of "taxable profit (loss)" of the partnership (see Schedule A column (7)), adjusted for an assumed sale of all of the equipment (see note (G)), less the balance of a one unit limited partner's capital account ($2,964) at such time.

APPENDIX A
(continued)

DARTMOUTH ASSOCIATES
SCHEDULE B

LIMITED PARTNER'S CONTRIBUTION  $49,993

Projections of taxable events are made for informational purposes only, and they have not been passed upon by counsel. The projections do not take into account the effect, if any, of the maximum tax, the minimum tax and the investment interest limitation on the particular circumstances of individual investors. They are based upon the assumptions, and are subject to the risks described in the accompanying memorandum, and must be viewed in light of such assumptions and risks (see particularly the discussions under "Federal Tax Consequences"). No representations or warranties are being made as to tax effect, depreciable lives, methods and allocations, or legal effect of the transaction.

| | (1) | (2) | (3) (A) | (4) (B) | (5) (C) | (6) (D) | (7) (E) After tax cash benefit 55% bracket | (8) (F) | |
|---|---|---|---|---|---|---|---|---|---|
| Year | Purchase installment | Interest | Annual cash outlay | Annual taxable profit (loss) | Annual cash distribution | Annual benefit | net benefit | Net cumulative | Year |
| 1977 | 10,640 | | 10,640 | (41,781) | 36 | 23,016 | 12,376 | 12,376 | 1977 |
| 1978 | 21,270 | 2,755 | 24,025 | (58,218) | 63 | 32,083 | 8,058 | 20,433 | 1978 |
| 1979 | 10,110 | 1,266 | 11,376 | (23,509) | 63 | 12,993 | 1,617 | 22,050 | 1979 |
| 1980 | 7,973 | 558 | 8,531 | (15,834) | 63 | 8,772 | 241 | 22,291 | 1980 |
| 1981 | | | | (15,838) | 63 | 8,774 | 8,774 | 31,065 | 1981 |
| 1982 | | | | 18,237 | 63 | (9,967) | (9,967) | 21,098 | 1982 |
| 1983 | | | | 52,719 | 63 | (28,932) | (28,932) | (7,835) | 1983 |
| *Residual value* (G) | | | | | | | | | |
| 1984 (0%) | | | | 30,085 | 16 | (16,531) | (16,531) | (24,366) | |
| 1984 (10 - $358,969) | | | | 65,552 | 35,482 | (572) | (572) | (8,407) | |
| 1984 (16 - 574,351) | | | | 86,831 | 56,762 | (9,005) | 9,005 | 1,170 | |
| 1984 (25 - 735,887) | | | | 102,791 | 72,722 | 16,187 | 16,187 | 8,352 | |
| 1984 (30 - 825,630) | | | | 111,658 | 81,589 | 20,177 | 20,177 | 12,342 | |
| 1984 (40 - 1,005,114) | | | | 129,391 | 99,322 | 28,157 | 28,157 | 20,322 | |

*Notes*

(A) The 1977 installment in column (1) is payable in cash upon subscription to a unit of the partnership. The remaining installments represent payments in satisfaction of limited partners' notes secured by letter of credit. Column (2) is calculated at 7% per annum on the unpaid portion of the limited partners' notes. The installment payments and interest thereon are payable annually. Column (3) equals the sum of limited partners' installment payments (column 1) and interest thereon (column 2).

(B) Column (4) equals a one unit limited partner's 9.88% share of "taxable profit (loss)" of the partnership and interest share.

(C) Column 5 represents annual net cash-flow from operations available for distribution applicable to a one unit share.

(D) Column 6 equals the sum of 55% of "Annual taxable profit (loss)" (column 4) and "Annual cash distribution" (column 5).

(E) Column (7) equals "Annual benefit" (column 6) less "Annual cash outlay" (column 3).

(F) Column (8) is the cumulative sum of column (7).

(G) The alternative figures for 1984 assume a sale of all of the equipment for different amounts constituting different percentages of the original purchase price.

*Represents a unit (99.88%) limited partner's share of "taxable profit (loss)" of the partnership (see Schedule A column (7)), adjusted for an assumed sale of all of the equipment (see note (G)), less the balance of a one unit limited partner's capital account ($2,964) at such time.

September 21, 1977

## APPENDIX B

### SECURITY AND LOAN AGREEMENT
Dated as of June 15, 1977 * * *

\*  \*  \*  \*  \*  \*  \*

5. *Liability of Borrower.* Except as otherwise provided in this Section 5, the Borrower shall have no personal liability hereunder, including without limitation, any liability to pay the principal of or interest on the Loan or any other amount which may at any time be payable to the Lender hereunder, and the Lender agrees to take no action against the Borrower personally except such as may be necessary to subject to the satisfaction of the indebtedness the Borrower's interest in the Equipment, the Leases and any sums due or to become due under the Leases. The Borrower shall, however, be personally liable hereunder, but only to the extent hereinafter set forth (the "At Risk Amount"), in the event that (i) as a result of a default hereunder the Lender forecloses its lien on the Equipment, (ii) the Equipment is sold upon and pursuant to such foreclosure for a gross sale price of less than $975,000 and (iii) the Lender, prior to January 1, 1982, obtains a final deficiency judgment against the Borrower in an amount no greater than the At Risk Amount. The At Risk Amount shall be that amount, if any, by which the sum of $975,000 exceeds the gross sale price, if any, of the Equipment upon such foreclosure sale. In the event of any inconsistency between the foregoing provisions of this Section 5 and any other provision herein contained, the foregoing provisions of this Section 5 shall prevail. Notwithstanding the foregoing, at any time the Lender shall have recourse against the "income and proceeds from the Equipment" and the Lender may look to such income and proceeds to the extent available for distribution to the Lender. As used herein the phrase "income and proceeds from the Equipment" shall mean:

(a) If one of the events of default specified in Section 8 hereof shall have occurred and be continuing and the Lender shall have declared the Loan to be due and payable in accordance with the provisions of Section 8 hereof, so much of the following amounts as are indefeasibly received by the Borrower or the Lender at any time after such event of default and during the continuance of such event of default:

(i) all Rent (as defined in the Lease) and any other sums due or to become due under the Lease (after deducting all reasonable and necessary out-of-pocket costs and expenses of collection thereof actually incurred by the Borrower); and

(ii) any and all payments or proceeds received by the Borrower or the Lender for or with respect to the Equipment under the Lease, or as a result of the sale or other disposition thereof (after deducting all reasonable and necessary out-of-pocket costs and expenses of such sale or other disposition actually incurred by the Borrower); and

(b) at any other time, only that portion of the amounts referred to in clauses (a)(i) and (a)(ii) of this Section 5 as are indefeasibly received by the

Borrower or the Lender and as shall equal all amounts due and payable to the Lender with respect to the Loan.

Subject to the limitation on liability of the Borrower herein contained (including, but not limited to, such limitations as are referred to in clauses (a)(i) and (a)(ii) of this Section 5), the obligation of the Borrower to pay the principal of and interest on the Loan and all other amounts payable to the Lender hereunder shall be fully enforceable (by appropriate proceedings against the Borrower in law or in equity or otherwise) against the Borrower's right, title and interest in the Equipment, its interest in the Lease and the Rent and any other sums due or to become due under the Lease, and nothing contained herein limiting the liability of the Borrower shall derogate from the right of the Lender to enforce, as provided in Section 8 hereof, its security interest in the Collateral for the unpaid principal of and interest on the Loan and all other amounts payable to the Lender hereunder and under the Notes, including, without limitation, the right to accelerate the maturity of payments on the Loan as provided herein upon an event of default hereunder and to proceed against the Lessee or the Lessor under the Leases for any Rent and any other sums due or to become due under the Leases and to realize upon the Equipment.

\* \* \* \* \* \* \*

## SECURITY AND LOAN AMENDMENT AGREEMENT NO. 1

This Agreement dated as of September 1, 1977 between Sun Life Insurance Company of America (the "Lender") and Dartmouth Associates (the "Borrower").

WHEREAS, the Borrower and the Lender have entered into a Security and Loan Agreement dated as of June 15, 1977 (the "SLA"); and

WHEREAS, the Borrower and the Lender desire to amend the SLA to provide for financing of additional equipment to be purchased by the Borrower and leased to National Computer Rental, a division of National Equipment Rental, Ltd. ("NCR") pursuant to the terms of section 18A of the Computer Lease dated as of June 15, 1977 between NCR and the Borrower.

\* \* \* \* \* \* \*

(4) The At Risk Amount set forth in Section 5 of the SLA is increased from $975,000 to $1,030,000.00;