B & A DISTRIBUTING COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
B & A Distributing Co. v. Commissioner
Docket No. 26784-85.
United States Tax Court
T.C. Memo 1988-589; 1988 Tax Ct. Memo LEXIS 618; 56 T.C.M. (CCH) 958; T.C.M. (RIA) 88589; December 28, 1988; As amended January 3, 1989; As amended February 13, 1989 *618 Petitioner acquired used IBM computer equipment from H subject to short term leases made by prior owners to end users. The purchase price was paid by a relatively small amount of cash, four recourse notes representing about 16 percent of the purchase price, and the balance by a limited recourse note. Petitioner immediately leased the equipment to Funding Systems subject to the end user leases. The rental payments under the lease were matched to the monthly payments petitioner was required to make on the purchase money notes. Held: (1) The purchase price of the equipment petitioner agreed to pay was about the fair market value of the equipment including its residual value. (2) The transactions were not shams devoid of economic substance. (3) Petitioner acquired the benefits and burdens of ownership in the equipment through the transactions. (4) Petitioner's acquisition of an interest in the computer equipment constituted an activity engaged in for profit. (5) The notes given by petitioner as part of the purchase price created a valid indebtedness to the holder. (6) Petitioner was at risk in the transactions, for purposes of sec. 465, in the amount of the cash downpayment, *619 the recourse notes, and those parts of the payments required to be paid and stated to be "at risk" in Schedule A attached to and made a part of the limited recourse note. (7) Petitioner is not liable for increased interest under sec. 6621(c). Dana Taylor, for the petitioner. Janine Hook, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies in and additions to petitioner's Federal income tax liability as follows: Year
Deficiency
1976
$ 18,249.00
1977
16,241.00
1979
46,003.00
1980
54,174.00
1981
51,219.00
1982
25,131.00
After concessions, the issues for decision are (1) whether petitioner's transactions were sham transactions devoid of economic substance; (2) whether petitioner acquired the benefits and burdens of ownership of the equipment involved through its participation in this transaction; (3) whether petitioner's acquisition of an interest in computer mainframes and peripherals constituted an activity engaged in for profit; (4) whether the petitioner established that a valid indebtedness existed *623 as required by section 163(a) of the Internal Revenue Code; [1] (5) whether petitioner's deductions are limited under the at-risk provisions to its cash investment; and (6) whether petitioner is liable for increased interest under I.R.C. section 6621(c) because it substantially understated its tax due to a tax motivated transaction, its computer leasing activity. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioner, B & A Distributing Company, is an Oregon corporation whose principal place of business is Portland, Oregon. Petitioner is engaged in the business of operating a retail sporting goods store and also operating a wholesale division for the international importation and distribution of white water rafts and accessories. In 1978, petitioner had realized substantial profits *624 which were invested in a variety of short term and long term investments. At that time, petitioner began to consider the conversion of some of its short term investments into long term investments and consulted its accountants, Arthur Young & Co., who introduced petitioner's president, Dan Baxter ("Baxter") to Mr. James Winkler ("Winkler"). Winkler is an attorney and licensed investment advisor who owns a NASD (National Association of Securities Dealers) broker dealership. Baxter and Winkler subsequently examined a variety of long term investments for petitioner. Those investments included an airplane sale-leaseback, apartments, commercial buildings, railroad cars, oil and gas drilling, and equipment leasing. Winkler and Baxter ultimately decided that a computer leasing investment was best suited for petitioner's needs because they felt that computer equipment was in demand, there were companies ready to lease, and in many cases the end user was already leasing the equipment. The Transaction
Baxter relied upon Winkler to locate suitable equipment for petitioner to acquire for use in its contemplated computer sale-leaseback venture. Winkler subsequently contacted Mr. Joel *625 Mallin ("Mallin") who was an attorney and broker with the Leasing Equipment Group, Ltd. Mallin, in locating suitable equipment for petitioner, worked with a company known as Funding Systems Leasing Corporation ("Funding Systems"), which was a subsidiary of Funding Systems Corporation ("FSC"), a large publicly held company. Mallin presented petitioner with approximately ten different computer configurations, all of which were rejected by petitioner. Petitioner seriously considered purchasing computer equipment located in England, but did not go through with that transaction because it failed to receive sufficient information as to the end user's creditworthiness. Since Funding Systems had no other equipment in its inventory which would satisfy petitioner's needs, it contacted Alanthus Corporation ("Alanthus"), its strongest competitor. Because of Alanthus' status as a direct competitor of Funding Systems, it wanted to maintain direct control of, and contact with, the existing end users of the equipment. In order to achieve that goal, Alanthus and Funding Systems entered into a rather elaborate arrangement which enabled Alanthus to maintain client control over the end users of *626 equipment made available to petitioner but permitted Funding Systems to transfer the equipment to petitioner for purposes of the contemplated sale-leaseback transactions. It was agreed that Alanthus would sell the targeted equipment to its wholly owned subsidiary, Alanthus Equipment Corp. ("AEC"), and thereafter Funding Systems would purchase the equipment from AEC through a newly formed limited partnership called Venfund Associates ("Venfund"), in which Funding Systems would own 99 percent interest as the limited partner and Alanthus would own one percent interest as the general partner. After Funding Systems purchased the equipment from Venfund, it leased the equipment back to Venfund. Thus, Funding Systems obtained ownership of the equipment for resale to the investors, while Venfund became the lessor to the end users. Moreover, as general partner of Venfund, Alanthus would control and manage contact with the end users, while Funding Systems received 99 percent of all partnership profits and losses as the 99 percent limited partner. The equipment purchased by Funding Systems from Alanthus through Venfund had been leased by Alanthus to three end users. Taylor Machine Works, *627 Inc., leased an IBM 370/148 computer and peripheral equipment commencing April, 1978. Black and Decker Manufacturing Company had leased an IBM 370/138 computer and peripheral equipment in March, 1977. Lightolier, Inc. had leased an IBM 370/135 computer and peripheral equipment in November, 1977. Alanthus' purchase of the computers and peripherals were financed by Bankers Trust Company, First National State Bank of New Jersey, and National Bank of Westchester, respectively. After the initial lease to the three end users, Alanthus sold its interest in the IBM computers and peripheral equipment, subject to the underlying leases to the end users, to AEC for no downpayment. AEC agreed to take over the payments of Alanthus to the banks, which were in fact being paid directly by the end users. AEC in turn sold its interest in the IBM computers and peripheral equipment, subject to the underlying leases, to Venfund for $ 1,173,362, payable by cash downpayment of $ 85,000 and a note in the amount of $ 1,088,362. The note was subject to payment terms set forth in a schedule allegedly attached to the note. The parties to the note, however, have been unable to find that schedule. On January 31, 1979, petitioner *628 and a number of other entities, both related and unrelated, entered into a complex series of transactions which produced the sale-leaseback arrangement that is involved in this case. All of the following transactions occurred on the same day and at the same place. First, Venfund sold its interest in the IBM computers and peripheral equipment, subject to the underlying leases to end users, to Funding Systems. Venfund retained a security interest in the IBM computers and peripheral equipment. Funding Systems then leased the IBM computers and peripheral equipment back to Venfund. Funding Systems also entered into a Remarketing Agreement with Venfund. Pursuant to the Remarketing Agreement, Venfund was to act as an agent of Funding Systems for the remarketing of the equipment upon termination of the Venfund/Funding Systems lease. For its services as a remarketing agent, Venfund was to receive 10 percent of the net proceeds received by Funding Systems from the remarketing of the equipment at the end of the nine year leases. Funding Systems' purchase price for the equipment was $ 1,000,000 of which $ 110,000 was payable at closing; the balance of $ 890,000 was payable in 108 consecutive *629 monthly installments of $ 13,766.12. The monthly lease payments owed by Venfund to Funding Systems were also $ 13,766.12. Next, Funding Systems sold its interest in the IBM computers and peripheral equipment, subject to the underlying end-user leases, to a wholly owned subsidiary called GBC Corporation for $ 1,092,500. The agreement called for a cash downpayment of $ 3,700. The balance of the purchase price was represented by a recourse promissory note in the amount of $ 1,088,800. The recourse note was amortized at $ 16,532.59 for 108 months. GBC Corporation then sold its interest in the IBM computers and peripheral equipment, subject to the underlying end user leases, to Horizon Leasing Corporation ("Horizon"), for $ 1,092,500. A downpayment of $ 3,700 was payable upon closing and the balance of $ 1,088,800 was payable over 108 months. The balance of the purchase price was represented by a recourse promissory note in the amount of $ 1,088,800. The recourse note was amortized in the same way at the same rate as the Funding Systems/GBC note outlined above. Funding Systems would only agree to sell the equipment on a recourse basis, and petitioner did not wish to give a *630 full recourse note on the deferred portion of the equipment's purchase price. Horizon agreed to accept the risk of purchasing the equipment from Funding Systems (through GBC) at a purchase price of $ 1,092,500, with full recourse liability. Horizon then agreed to sell the equipment to petitioner for $ 1,100,000, accepting back from petitioner partial recourse liability, because Horizon was satisfied that the value of the equipment would, at any time, be sufficient to secure petitioner's performance under the nonrecourse portion of petitioner's obligation. The transaction was structured so that petitioner's purchase price was $ 1,100,000, represented by a cash downpayment of $ 11,200 and a limited recourse promissory note in the amount of $ 1,088,800. The limited recourse promissory note included four recourse notes totalling $ 186,500. The limited recourse promissory note also contained schedules describing petitioner's recourse liability for the remaining $ 902,300 principal payments. The recourse liability under the note was on a sliding scale. It started at zero (when the four recourse notes totalling $ 186,500 were outstanding), then increased at first and then decreased *631 as petitioner's cash payments to Horizon plus the value of the equipment approached the unpaid balance due on the note. The limited recourse promissory note provided for interest accruing on the unpaid principal balance at 12 percent per annum, and for debt service (principal and interest) amortized over a period of 108 consecutive months with monthly installments of $ 16,532.59 commencing February 28, 1979. Excluding petitioner's payment of $ 186,500 due under the recourse notes, Funding Systems lease payments to petitioner were exactly sufficient in timing and amount to fund petitioner's debt service to Horizon under the limited recourse promissory note, and also provide petitioner with an excess cash flow of $ 125 per month. Although it was common for an investor's cash payments to be spread out over a period of three years, petitioner managed to negotiate payment terms on its cash investment for a period of five years. Petitioner also negotiated a $ 15,565.46 discount on the four recourse notes in return for making a $ 170,934.54 prepayment. That discount was reported by petitioner on his Federal income tax return for fiscal year ending January 31, 1980 as income from a *632 "forgiveness of liability." The discount resulted in decreasing the unpaid balance on the purchase price of equipment and reducing Funding System's initial profit by a like amount. Petitioner also negotiated to have a portion of its legal fees paid out of Winkler's commission. Analysis of Computer Investment
A crucial aspect of this case is whether petitioner could have reasonably expected to earn a profit from its computer equipment investment. Baxter testified that he both expected and intended to make a profit in this transaction, but we must look further and examine the viability of this assertion. An essential element in that determination is the anticipated residual value of the computer equipment at the expiration of the end user leases. To assess this question, petitioner commissioned its attorney, James Kennedy ("Kennedy"), to conduct an investigation as to the expected residual value of IBM 370 equipment at the end of the 108 month lease term. Subsequently, Kennedy contacted various computer users, lenders, consultants, and sales organizations in an effort to determine the residual value of the equipment in question. Based upon his investigation, Kennedy concluded *633 that petitioner's equipment would have a residual value in the United States ranging between 10 and 20 percent of the original purchase price after 108 months, when petitioner's lease to Funding Systems expired. Kennedy reached this conclusion after contacting seven individuals, three of whom would not express an opinion. The four who did express an opinion, including a Mr. Dan Cyr from Computer Products, Unlimited, supported the 10-20 percent estimate. Petitioner also obtained an appraisal opinion from Mr. Howard Haftel ("Haftel"). Haftel's oral appraisal, which was later confirmed by a written report, substantiated Kennedy's conclusion that the equipment would have a projected residual value in the United States of approximately 20 percent of the equipment's purchase price after nine years, and that the proposed purchase price was equal to fair market value. Petitioner also contacted two accounting firms which reviewed the proposed transaction. Baxter asked his in-house bookkeeper to prepare a cash flow spread sheet in order to analyze the investment's economic viability. In light of this information, petitioner considered its maximum risk on a worst case basis to be a loss *634 of approximately $ 74,000. This loss would result if only a 10 percent residual value were realized on the equipment. Petitioner, pursuant to Haftel's estimate, also considered it possible to sell the equipment in the European or Third World markets for approximately 40 percent of the purchase price after Funding System's lease expired, which would result in a profit of approximately $ 187,000. Finally, that analysis showed a profit of $ 25,000 if Haftel's 20 percent projected residual value were realized in the domestic market. Expert Testimony on Residual Value
"Residual values" are the open market prices at which used computer systems can be sold at any point in time. Typically, in a leasing transaction, the point of focus is on the potential residual value at the end of the fixed period of the lease to which a computer system is subject. If the residual value is ultimately higher than anticipated, the owner's economic returns can be greatly enhanced. Conversely, if the residual value decreases below the anticipated level, the owner's economic profit will suffer. Both parties offered extensive testimony of expert witnesses on the residual value of the equipment involved *635 in these transactions. We have analyzed the testimony of those experts to determine whether petitioner was justified in believing when he entered into this transaction that the equipment had an anticipated residual value that could support a profit on the transactions. We believe the evidence as a whole supports an affirmative conclusion to that question. We are attaching hereto an addendum (A) discussing the testimony of the expert witnesses, their conclusions and the basis of those conclusions. The Computer Market
Based on the evidence in this case we find as follows. Obsolescence in the computer industry occurs primarily in response to significant technological advances. This growth process, and its commensurate effect on existing market values, has traditionally been dictated by the introduction of new products and price changes by IBM and its major competitors. Consequently, both products and companies have developed at varying rates. In the mid 1950s, the computer industry came into its own with the availability of vacuum tube technology. The primary equipment available was the IBM 650, 704, 705 and 709 tabulating equipment. By the late 1950s the IBM 1400 and *636 7000 series computers were introduced. The price performance of this equipment was substantially better than that of the vacuum tube equipment, and the reliability of the processors was vastly improved. This solid state technology constituted the first true operating system. Moreover, software could now be developed that was somewhat independent of the equipment being utilized. In the early 1960s, IBM had a major impact on the computer world with the announcement of the IBM 360 series of computers. This product line was a drastic departure from previous IBM offerings in that it combined in a single family unit the entire spectrum of computer needs at the time, from scientific to business applications. The 360 series represented a bold departure from the existing technology because it displaced everything that preceded it. Thus, major changes in existing software were required. This engendered considerable criticism regarding the requirements to make these changes. However, this new technology did bring with it more powerful operating systems, telecommunications, and a wide variety of input/output devices. Memory sizes were increased tenfold and the on-line storage of data *637 was a cost effective reality. Again, price performance with the equipment was such that more users were emerging. By the late 1960s the industry had stabilized. The 1400 and 7000 equipment was still in use in this country but it had also become the primary equipment in use in Europe and many Third World countries. In addition, other manufacturers began to introduce systems to compete with IBM 360, and some were beginning to produce add-on memory and peripherals. Each of these elements served to improve the overall price performance of systems for the user and established the 360 series computer as a standard in the industry. In mid-1970 IBM introduced the 370 series computer. This equipment was initially announced as having three models, the 145, 155 and 165. Unlike the 360 series introduction, the 370 series did not require any software changes. This meant that the 360 and 370 computers were compatible. The 370 could use all of the peripherals used by the 360 equipment. However, the price performance of the new (370) equipment was better than that of the old (360) equipment being replaced. Between 1971 and early 1976, IBM announced several expansions of the 370 line of *638 computers. Three smaller models (115, 125, and 135) were announced and the upper lines also expanded (158, 158-3, 165-3 and 168). All of this equipment continued to be compatible with the 360 series of equipment, and in many cases, 1400 series capability was also available. In mid-1976, the 370 series model 138 and 148 were announced, and deliveries were available before the end of the year. In the first quarter of 1977, IBM made two major announcements. First was a significant price reduction of two large scale 370 systems (158 and 168 models). Secondly, they announced the 303X series computers. This equipment would replace the large 158 and 168 systems and extend the upper end of the large systems market which was just beginning to develop. [2] Again, with the 303X series there were significant price/performance improvements. Memory speed had been increased, reliability was improving and most importantly, software compatibility had been maintained. The 370 series computers, provided a gradual and evolutionary change from the 360 computer technology. This trend was continued with the 303X series computers. *639 The 303X series of computers continued to be compatible with the 360 and 370 series equipment. Software was independent of the operating system and could function on almost all of the equipment in question. The input/output devices were also compatible. This enhanced the continued marketability of the 360 and 370 equipment in the used market. It also helped establish the European and Third World markets. Due to IBM's policy of guaranteed "as new" maintenance, regardless of owner, computer models become obsolete due to an inability to compete with advanced models rather than an inability to maintain their original functional capabilities. Thus, for purposes of considering the life cycle of a computer model, all models are aged from the date that the first unit is delivered, without regard as to when a specific unit is actually manufactured. In January 1979, there was no functional difference between new and used IBM 370 series equipment because IBM maintained used equipment in an "as new" condition. In the mid-1970s there had been rumors in the industry that IBM would be making another drastic change in computer technology with the introduction of "future systems" but those *640 rumors were publicly dispelled by IBM. However, during the latter part of 1978, a number of events again signaled the possible release of a new technology by IBM. For example, by mid-1978, IBM had reduced list prices on models 138 and 148 and had taken them out of production. In addition, numerous articles throughout 1978 in various computer trade journals, business journals and newspapers evidenced computer industry perception of upcoming IBM products changes, most notably the introduction of "E series." The industry anticipated the rumored "E series" would have approximately twice the price/performance ability of existing equipment. On January 30, 1979, one day before the transaction involved in this case, the 4300 series was announced by IBM. The 4300 series had a price performance increase of approximately four to one, which was far above IBM's historical improvements. Again, compatibility was maintained for input/output devices as well as software programs. Thus, for the most part, there was equipment and software compatibility between the 360, 370, 303X, and 4300 series computers. Because of the inter-system compatibility, the 4300 series was simply another progression *641 in the cycle of technological improvement by IBM. The 4300 series appeared to be a replacement for the middle and upper end 370 series and a stepping stone to the larger 303X series equipment. It was smaller and significantly faster, required less electricity, generated less heat, and appeared to be at least as reliable as the 370 equipment. In short, the level of change created by the 4300 series of equipment was quite dramatic. The IBM 4300 line of processors introduced the most abrupt departure from traditional IBM pricing policies that had ever been encountered by the computer industry. Consequently, the announcement and delivery in 1979 of the IBM 4300 was the single action that most affected the residual value predictions of previous IBM mainframe computers. This new, and radically different, pricing strategy in 1979 reduced the previous expectations of mainframe residual values. The computer industry analysts, prior to the official release, generally underestimated the degree of improvement that IBM would give to the 4300 family. Following the release, they almost in concert agreed that this vast change in price performance was only the beginning of a new IBM marketing *642 strategy -- that IBM would apply similar improvements and price-performance to more and more products. However, IBM once again upset the popular predictions. Rather than continue the price reduction trend, IBM, in 1980, announced a sequence of price increases of their computer mainframe products. [3]
In summary, petitioner based the depreciation and interest deductions, which gave rise to the deficiency in this case, on the IBM computer equipment which it purchased from Horizon. Petitioner purchased the equipment, subject to the end user leases, for $ 1,100,000. That price included a $ 11,200 downpayment to Horizon together with a limited recourse promissory note in the amount of $ 1,088,800. The limited recourse promissory note included four recourse notes totalling $ 186,500. In addition, the limited recourse promissory note contained a schedule of recourse liability which shifted throughout the loan term. On the same day, petitioner leased the IBM equipment which it had purchased *643 from Horizon to Funding Systems. The rent payable by Funding Systems under the lease exceeds the principal and interest payments due to Horizon under the limited recourse promissory note by $ 125 per month. The term of the Funding Systems lease matches the term of petitioners note to Horizon. After these transactions were completed, petitioner deducted depreciation and interest deductions based on the equipment purchased. Petitioner also realized the $ 125 monthly rental income from the Funding Systems lease. The result was a net loss in some years which petitioner used as a deduction against other unrelated income. OPINION The primary issue we must decide is whether petitioner is entitled to depreciation and interest expense deductions arising from petitioner's participation in the acquisition, sale and leaseback of certain IBM computer systems. Respondent argues that the sale to petitioner was a sham and should be disregarded for Federal income tax purposes because it lacked economic substance and was devoid of business purpose. In the alternative respondent contends that petitioners' deductions should be limited pursuant to sections 183 and 465 because petitioner lacked *644 the requisite profit motive and was not at-risk for the full amount of the purchase price. Petitioners argue that the transaction was a bona fide business transaction entered into with a business purpose and which had economic substance and which should be respected for Federal tax purposes. It also counters respondent's position that it was at risk in its computer investment only up to the amount of its cash investment. Economic Substance
Generally, a transaction that has genuine economic substance and conforms with business realities will be respected for tax purposes. Frank Lyon Co. v. United States,435 U.S. 561, 585 (1978); Estate of Thomas v. Commissioner,84 T.C. 412, 432 (1985). The existence of tax benefits accruing to an investor as a result of the transaction does not necessarily deprive the transaction of economic substance. Frank Lyon Co. v. United States, supra at 581; Packard v. Commissioner85 T.C. 397, 417 (1985); Estate of Thomas v. Commissioner, supra at 432. In Frank Lyon Co. v. United States, supra at 580, the Supreme Court said "We cannot ignore the *645 reality that tax laws affect the shape of nearly every business." However, if a transaction has no economic purpose other than to obtain favorable tax consequences, the form of the transaction will be disregarded by the Court. Gefen v. Commissioner, supra;Grodt and McKay Realty, Inc. v. Commissioner,79 T.C. 1221, 1243, 1244 (1981). In other words, merely because a taxpayer enters into a transaction with one of its purposes being tax reduction does not deprive that transaction of recognition for Federal tax purposes. If the form of the transaction reflects its substance, and its substance meets the requirements of the law, and tax avoidance is not the sole purpose of the transaction, generally the transaction will be recognized for tax purposes. Gregory v. Helvering,293 U.S. 465 (1935). In Frank Lyon Co. v. Commissioner, supra, the Supreme Court addressed the question of whether a sale and leaseback of an office building should be respected for tax purposes. Finding that sufficient non-tax reasons existed for the transaction, and that the lessor retained sufficient attributes of a traditional lessor, the Court respected the *646 form of transaction, giving the purchaser/lessor interest, depreciation and other deductions in connection with the arrangement. This interpretation of Frank Lyon was affirmed in Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89 (4th Cir. 1985), affg. in part and reversing in part 81 T.C. 184 (1983). There it was held that a sale and leaseback would be respected for Federal tax purposes if we find that either (1) the taxpayer had a business purpose for the transaction such as economic profit apart from tax benefits, or (2) there was a realistic objective possibility of economic profit on the part of the investors. Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 209. While the overall transaction involved here was structured in a round about way, which may call for a close look, we find that it accomplished petitioner's purpose of getting into the business of computer leasing and that it had reasonable prospects of being profitable to petitioner. Petitioner explained that the reasons for the rather convoluted structure of the transaction were that Alanthus did not want to give up its contact with the end-users it had *647 contracted with, and that while Funding Systems would only agree to sell the equipment on a recourse basis petitioner did not wish to give a full recourse note on the deferred portion of the equipment's purchase price. Consequently, intermediaries were required to accomplish the objective. Since the objective was accomplished we cannot find that the transaction was a sham entirely lacking in economic substance. In Estate of Thomas v Commissioner, supra, in rejecting respondent's claim that the purchaser/lessor was not the true owner of the asset involved, we summarized the test set for this in Rice's Toyota as one which requires the transaction to meet either the subjective "business purpose" test, or a more objective "economic substance" test. Here, we find that the transaction meets the economic substance test despite the steps taken to get there. This Court has addressed economic substance questions involving computer leasing arrangements many times, and has generally examined certain salient factors in making our determination. In Mukerji v. Commissioner,87 T.C. 926 (1986), we noted that the record showed: (1) the taxpayer paid an amount *648 approximately equal to or below fair market value for the equipment, and (2) the anticipated cash flow received by the taxpayer during the time the lease on the equipment was in effect, plus the reasonably to be expected residual value at the end of the lease, exceeded the amount of the cash investment made by the taxpayer. From these facts, we concluded that the transaction had a reasonable possibility of economic profit Mukerji v. Commissioner, supra.
In Gefen v. Commissioner,87 T.C. 1471 (1986), we stated that "tax consequences cannot depend on unrealistic demands for certainty." Gefen v. Commissioner, supra at 1492. We accepted as reasonable that an appraiser's estimated residual value at the conclusion of the lease was 20 percent of the equipment's cost even though, because of unexpected actions by the manufacturer, the equipment actually had no value at the termination of the lease. In holding as we did, we pointed out that it was the potential for profit at the time the transaction was entered into that demonstrated its economic substance. Gefen v. Commissioner, supra.
Judged by the standards of the cases *649 above discussed, the sale/leaseback transactions in this case should be recognized for tax purposes. Petitioner produced three expert witnesses who testified as to the market value of the equipment purchased and as to the relevant residual value estimates of the equipment at the time these transactions were completed. All agreed that the purchase price was at least equal to the market value of the equipment. In all instances, those estimates supported residual value assumptions necessary to project a realistic objective possibility of economic profit on the part of petitioner. Respondent produced two experts who refuted the residual value estimates of petitioner's experts. However, Rothschild's testimony must be discounted because it addressed valuation from a manufacturer's standpoint rather than with respect to the used equipment retail marketplace. Blumenthal's testimony and methods varied markedly from petitioner's experts. This highlights the inherent difficulty in making residual value estimates in a complex and volatile industry. Given this volatility, and its effects on residual value projections, we find that there was a realistic objective possibility of economic *650 profit on the part of petitioner in this transaction based on the expert testimony it presented. Much has been made of IBM's January 30, 1979, introduction of the 4300 series, which could undermine petitioner's reliance on residual values to recoup his investment. Admittedly, there had been strong indications in the computer market place throughout 1978 that such an announcement was imminent. However, such rumors were commonplace in the industry and could not be completely relied upon. Although the announcement of the 4300 series did in fact pre-date this transaction by one day, petitioner was probably unable to assess its resulting impact on 370 series residual values nine years later. Apparently, those values actually fluctuated during that time as IBM's pricing strategies varied. Although we rely on the residual values of the equipment determined by petitioner's expert witnesses, it should be noted that petitioner's agent (Kennedy) did contact Haftel with regard to this question before entering the transaction. The residual value as determined by Haftel, given orally before the transaction, was in excess of the amount needed to afford petitioner a profit with respect to *651 this transaction. The relevance of this valuation is the influence it may have had on petitioner's subjective intent in entering into the transactions. Additional evidence also supports petitioner's contention that it had a subjective business purpose in these transactions. Petitioner engaged in a business-like examination of the merits of these transactions. Baxter examined many competing investments before selecting computer leasing. Then Baxter, through Winkler and Mallin, researched and evaluated many domestic and some foreign equipment for purchase and leaseback. Before deciding to purchase the equipment in question, Baxter completed an in house economic analysis on the potential return available, and concluded that petitioner could in fact recoup its investment and make a profit. In that examination, Baxter used cash flow and residual value estimates which were reasonable under the circumstances. From the facts and evidence presented, we conclude that petitioner had a business purpose in entering into this transaction in addition to its recognized purpose of saving taxes, that petitioner intended to make a profit on the transaction and justifiably believed that a profit *652 could be realized, that the transaction in the form arranged and executed did have economic substance and should not be categorized as a sham. Benefits and Burdens of Ownership
The second issue for decision is whether petitioner assumed sufficient benefits and burdens of ownership to be regarded as the owner of the computer equipment for Federal income tax purposes. Our holding that petitioner's transactions are not tax avoidance schemes devoid of economic substance, does not foreclose further consideration of whether the form of such transactions must be accepted for Federal tax purposes. Packard v. Commissioner,85 T.C. 397, 419 (1985), citing Commissioner v. Court Holding Co.,324 U.S. 331, 334 (1945). Respondent contends that petitioner does not possess sufficient attributes of ownership to be considered the owner of the computer equipment. We disagree. This issue presents a "question of fact which must be ascertained from the intention of the parties as evidenced by written agreements read in the light of the attending facts and circumstances. Haggard v. Commissioner,24 T.C. 1124, 1129 (1955), affd. 241 F. 2d 288 (9th Cir. 1956). *653 " Grodt and McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237 (1981). There can be no question that petitioner acquired legal title to the equipment, and respondent does not argue otherwise. Rather, respondent argues that petitioner did not acquire the benefits and burdens of ownership required for tax purposes. Frank Lyon Co. v. United States,435 U.S. 561 (1978). These requirements have been discussed at length by this and other courts in recent cases. See Levy v. Commissioner, 91 T.C. No.    (Nov. 2, 1988; Estate of Thomas v. Commissioner,84 T.C. 412 (1985); Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184 (1983), affd. in part and revd. in part 752 F.2d 89 (4th Cir. 1985); Swift Dodge v. Commissioner,76 T.C. 547 (1981), revd. 672 F.2d 651 (9th Cir. 1982); and we see no benefit in discussing them at length here. Some of the factors that have been considered in sale-leaseback transactions are: (1) whether the owner-lessor had the attributes of a true lessor; (2) whether the consideration paid for the property was a nonrecourse note; (3) whether the *654 purchaser acquired or retained an equity interest in the property; (4) the existence of a useful life in the property in excess of the leaseback term; (5) whether the leased property had a residual value at the termination of the lease; (6) whether there was a "turn around" point which would result in the lessor's realizing income in excess of tax deductions in the late years of the lease; and (7) whether the lessor retained an ownership interest in the property on terminating the lease. Applying the facts in this case to the relevant factors mentioned above we find that petitioner had the attributes of a true owner. It purchased and acquired both a legal and an equity interest in the equipment, the equipment had a probable useful life in excess of the lease term and had a residual value at the proposed termination of the lease, and petitioner retained an ownership interest in the equipment at the termination of the lease. The consideration petitioner paid for the equipment was a cash downpayment, four recourse notes having a total face value of $ 186,000, and a limited recourse note which fixed petitioner's recourse liability thereon on a sliding scale so that the depreciated value *655 of the equipment plus the amount of petitioner's recourse liability more than equalled the unpaid balance due on the note. The fact that a lease was a net lease and non-recourse have been accepted in this type of transaction and inquiry. Estate of Thomas v. Commissioner, supra.Petitioner's equity interest in the equipment increased with each payment made by Funding to Horizon (rental payments on the equipment due from Funding to petitioner which equalled the payments due on the limited recourse note from petitioner to Horizon which circular payment plan the parties agreed to). In Estate of Thomas v. Commissioner, supra, we looked to the facts in Frank Lyon Co. v. United States, supra, establishing a level of ownership attributes sufficient to satisfy the requirements of ownership for Federal tax purposes. In Frank Lyon Co., the taxpayer's cash investment in the property purchased (subject to a leaseback) was approximately six percent. While petitioner's downpayment in this case was only one percent of the purchase price, petitioner made a first year prepayment of the installment obligation which raised its capital outlay *656 to over 16 percent of the purchase price. Moreover, in Frank Lyon Co., the potential lease term was close to the useful life of the property involved, while in this case the evidence received with respect to the equipment's estimated residual value at the time the transaction was entered into demonstrates that the useful life of the equipment here involved could have significantly exceeded the lease term. Applying the above factors to the evidence in this case we conclude that petitioner assumed sufficient benefits and burdens of ownership to be the owner of the computer equipment for Federal income tax purposes. Activity for Profit
Section 183(a) provides the general rule that where an individual is engaged in an activity, and "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(b)(1) provides that deductions which would be allowable without regard to whether such activity is engaged in for profit shall be allowed, and section 183(b)(2) provides that deductions which would be allowable only if such activity were engaged in for profit shall be allowed *657 "only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)." Section 183(c) defines an activity not engaged in for profit as follows: (c) Activity Not Engaged in for Profit Defined. -- For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. The question then is whether the computer activity in which petitioner was engaged during the years in question constituted a trade or business so that expenses incurred in connection with the activity were deductible under section 162. For an activity to satisfy the profit objective test of section 183, it must be carried on with an actual and honest profit objective. Levy v. Commissioner, 91 T.C.    (Nov. 2, 1988) (slip opinion at page 52). The expectation of profit need not be a reasonable one, but there must be a bona fide objective of realizing a profit. Allen v. Commissioner,72 T.C. 28, 33 (1979). The issue of whether there is an *658 objective to make a profit is one of the facts to be resolved on the basis of all the facts and circumstances of the case, and the burden of proving the requisite objective is upon petitioner. Abramson v. Commissioner, 86 T.C. 360, 370 (1986) [Text Deleted by Court Emendation]. Some of the factors that may be helpful in determining whether an activity is engaged in for profit are set forth in the regulations. [4] These factors are not applicable to every case, however, and a careful review of the facts and circumstances of each case remains the primary test. Abramson v. Commissioner, supra at 371. Petitioner's objective to realize a profit is supported by evidence presented. For example, petitioner engaged Kennedy to gather residual value information. Kennedy then interviewed a number of experts and reported that the transaction had likely profit potential. Petitioner also contacted Haftel, an independent expert appraiser, who corroborated its own residual value estimates and showed that the equipment's purchase price was fair market value. Finally, petitioner conducted its own cash flow analysis *659 which examined a wide range of possible outcomes and showed realistic profit potential. Other facts in this case are also indicative of a profit objective. For example, petitioner asked an accounting firm to review the financial statements of Funding Systems and the end users. When petitioner could not obtain financial information on certain European end users in an initial proposal, it declined purchasing the equipment. Petitioner also successfully engaged in negotiations relative to the transaction here involved which seem to reveal a profit objective, such as a negotiated $ 15,565.46 reduction in purchase price for prepayment on the recourse notes, as well as a reduction in Mallin's commission. Petitioner also persuaded Winkler to pay a portion of its attorney's fees. These facts all support petitioner's assertion that it had a bona fide profit objective in entering into this transaction. Bona Fide Indebtedness
Respondent asserts that petitioner is not entitled to deduct interest pursuant to section 163 on the limited recourse note because it is not a true liability and the amounts designated as interest are not really interest for tax purposes. We disagree. In *660 Rice's Toyota World, Inc. v. Commissioner, supra, the Fourth Circuit found that a nonrecourse note did not represent genuine debt because of its nonrecourse nature in conjunction with an inflated price. Here, petitioner has presented adequate evidence to prove that it did not pay an inflated purchase price. Petitioner cites Hudspeth v. Commissioner,509 F.2d 1224 (9th Cir. 1975), for the proposition that nonrecourse debt can constitute genuine section 163 debt where the notes are adequately secured by mortgages on real property. We agree that the facts in this case are similar. The limited recourse promissory note was secured by the equipment which was purchased for fair market value. As the limited recourse promissory note was paid down, the nonrecourse portion of the note did not exceed the equipment's anticipated residual values thereby assuring that petitioner would not "walk away" from the transaction, after acquiring substantial equity. Respondent emphasizes the journal entry or circular nature of the note payments in this transaction. We were faced with a similar situation in Mukerji v. Commissioner, supra, where taxpayers rental *661 receipts and debt service payments were also exactly matched in timing and amount. There we held, citing Estate of Thomas, supra, that such matching was nothing more than a commercial reality. Since the debt evidenced by the limited recourse promissory note represents a valid and enforceable obligation which petitioner cannot walk away from, we hold that the limited recourse promissory note should be upheld as a genuine indebtedness under section 163 and that petitioner's interest deductions should be allowed. At Risk Issue
The focus of respondent's at risk arguments are with respect to the limited recourse promissory note, which respondent seeks to recharacterize as nonrecourse debt. Section 465 limits a taxpayer's loss deductions to the extent that the taxpayer is "at risk" with respect to a given activity. A taxpayer is deemed to be at risk with respect to the amount of money, and adjusted basis of other property, contributed to the activity. Section 465(b)(1). In addition, a taxpayer is at risk to the extent that he is personally liable for repayment of borrowed amounts. Section 465(b)(2)(A). Respondent argues that petitioner is at risk with respect *662 to its computer investment only to the extent of its cash payments, without regard to petitioner's recourse liability under the limited recourse promissory note. Respondent supports this assertion by arguing that recourse liability is not a functional reality under the limited recourse promissory note because petitioner can never actually be in default. On this point, respondent relies on the acceleration provision of the limited recourse promissory note which states that an Event of Default will not occur in situations where Funding Systems fails to make its lease payments to petitioner. Since recourse liability arises only on an Event of Default pursuant to section 7.1 of the limited recourse promissory note, respondent argues that petitioner can never be exposed to recourse liability. Respondent further submits that, since lease payments by Funding Systems automatically resulted in note payments by petitioner, petitioner could never be in default and is thus not at risk. In other words, if Funding Systems defaults, petitioner is excused from payment and if Funding Systems does not default petitioner cannot default given the payment structure. The limited recourse provision *663 in the limited resource promissory note (paragraph 7.1 -- "Recourse Obligations") provides that Payor shall be personally liable only for (a) the interest and principal due during the times and in the amounts set forth in the Schedule A attached and (b) the recourse notes. The Schedule A attached lists "Payor's Maximum Aggregate Amount of Section 7.1 Recourse Obligations" during certain periods of time. The list of amounts starts with 0 on or before January 31, 1979, and increases each year until it reaches $ 570,000. "From February 1, 1982 through February 1, 1983 (inclusive)." The amounts listed are then reduced to $ 550,000 from February 1, 1984 to January 31, 1985, to $ 270,000 from February 1, 1985 through January 31, 1986, to $ 105,000 from February 1, 1986 through January 31, 1987, and to 0 from February 1, 1987 and thereafter. This would indicate that petitioner would be personally liable on the limited recourse promissory note for varying amounts from January 31, 1987; plus its personal liability under the recourse note (which was $ 186,500 but which was paid a short time after the transaction took place.) Paragraph 7.1 goes on to say that "Recourse Obligations shall be *664 determined in accordance with Schedule A, without giving effect to Section 5.2 hereof, so that, as to any occurrence which, without giving effect to Section 5.2, would otherwise constitute an Event of Default . . ., the Section 7.1 Recourse Obligations shall be determined as of the date of such occurrence . . .; provided, however, that payment may be deferred to the extent provided for in Section 5.2." [5]
Section 7.2 provides that any sums due hereunder except the recourse obligations set forth in Section 7.1 and the recourse notes themselves shall be nonrecourse. Section 5.2 provides that the Payor (petitioner) shall have the right to defer payment of principal and interest as the same become due "if and to the extent any amount of rent or other sums becoming due to the Payor under the lease (between Funding and petitioner) is not received by Payor as the same becomes due. The amount so deferred will become due and payable at such time as Payor receives from Payee (Horizon) or Funding the past due sum provided however that the entire amount *665 deferred shall become due and payable on January 31, 1994, whether or not Payor shall have received the past due sum. Section 6.1 of the note defines the term "Event of Default" which includes the failure of Debtor to promptly pay when due any payment due under the note, subject however to the provisions of Section 5. Section 6.2 of the note is headed "Acceleration" and provides that upon the occurrence of an "Event of Default" the entire unpaid balance shall at Payees option, be accelerated and become immediately due and payable and the "Secured Party" shall have all rights and remedies with respect to the Collateral of a secured party holding a purchase money security interest under the Uniform Commercial Code; provided that "an Event of Default" shall not be deemed to exist, so long as an Event of Default, as defined in the lease, by Funding as lessee, has occurred and is continuing. While the composition of the note in this respect, is unclear and not too consistent, we agree with petitioner that respondent's argument misinterprets the operational provisions of the limited recourse note. The recourse provision (Section 7.1) therein provided that recourse liability will arise *666 in accordance with the stated schedule upon the occurrence of an act that would otherwise give rise to an "Event of Default." An "Event of Default," as defined in Section 6.1, includes the situation where petitioner fails to make payments under the note when due. Respondent looks to Section 6.2 of the note and attempts to read its internal default definition (that an Event of Default shall not be deemed to exist so long as an Event of Default, as defined in the lease by Funding as lessee" has occurred) as being applicable to the recourse paragraph. We think that interpretation is incorrect in light of the express default definition in Section 6.1 of the note. The language in Section 6.2 applies to acceleration, at Payees option, and should not be used as an exception to petitioner's obligations under the lease. Petitioner's obligations under the lease are to make the payments under the note when due and whether deferred or timely the entire unpaid principal of the note will be due and payable on January 31, 1994. We conclude that petitioner was personally liable for the amounts due under Schedule A attached to the note and was "at risk" for that amount. Only if the holder *667 of the note failed to exercise its rights would petitioner avoid the risks it assumed under the note. Respondent also argues that petitioner is not at risk in this transaction because of the matched sale and leaseback payments. Such arrangements, where supported by legally enforceable agreements which otherwise satisfy at risk requirements, have generally been recognized by this Court provided the transaction was imbued with the required economic substance, etc. The fact that the income source used to satisfy promissory note obligations is the underlying leaseback payments should not, in and of itself, disqualify such obligations for at risk purposes. See Gefen v. Commissioner,87 T.C. 1471 (1986). Respondent, relying on Porrecca v. Commissioner,86 T.C. 821 (1986), urges us to recharacterize the limited recourse promissory note as nonrecourse due to the variable nature of petitioner's recourse liability. In Porrecca v. Commissioner,86 T.C. 821 (1986), we recharacterized an alleged variable recourse obligation as nonrecourse where the conversion was not triggered by "an event that has a substantial economic relationship to *668 the activity." 86 T.C. at 839. Here, petitioner's recourse liability did vary with the occurrence of two economic events which have a substantial relationship to petitioner's investment. Those events were depreciation of the equipment's value and petitioner's repayment on the debt. Moreover, in Porrecca, petitioner's limited recourse promissory note was converted to nonrecourse debt by payment of a nominal fee whereas here the conversion was on a graduated scale directly proportionate to perceived depreciation. We believe such a trigger is an economic event. Respondent also seeks to recharacterize petitioner's recourse liability by asserting that Horizon was interposed as a "strawman" solely to protect petitioner. Respondent relies on Tolwinski v. Commissioner,86 T.C. 1009 (1986), in which we held that the interposition of an entity, which had acquired the rights sold to taxpayer with nonrecourse financing protected the taxpayer from liability. We held there that this voided the effect of personal assumption agreements between taxpayer and the interposed entity for at risk purposes. We agree with petitioner that this case is distinguishable *669 from Tolwinsky because Horizon occupied a position of economic substance in the transaction. The interposition of Horizon was an economic and business necessity in this transaction. Thus, Horizon did in fact assume a genuine risk in this transaction which the interposed entity in Tolwinsky did not. Section 6621(d)
Respondent also seeks increased interest pursuant to section 6621(c). [6]Section 6621(c) provides for increase in the interest rate to 120 percent of the statutory rate on underpayments of tax if a substantial understatement is due to a tax motivated transaction. Section 6621(c)(3)(A) sets forth circumstances which were to be considered as tax motivated transactions for purposes of the 120 percent underpayment rate. Those circumstances included valuation overstatements pursuant to section 6659(c) and losses disallowed pursuant to section 465(a). Given our finding above that petitioner did not overvalue property and that petitioner was at risk under section 465, this cannot be considered a tax motivated transaction and thus the 120 percent overpayment rate is not applicable. To reflect the foregoing, Decision will *670 be entered for the petitioner.
Addendum A
Esmond C. Lyons ("Lyons"), was qualified to testify as an expert on behalf of petitioner. Lyons is a management consultant for SRI, formerly Stanford Research Institute in Menlo Park, California. From its founding immediately following World War II until 1970, SRI was an operation of Stanford University. Since 1970, SRI has been an independent corporation. SRI is a non-profit corporation which provides basic and applied research and consulting services to business and government clients throughout the world. SRI conducted a 1975 study which produced what is known as "SRI curve." The SRI curve, which Lyons used in analyzing this investment, is a computer residual value analysis tool which has been repeatedly used in the computer valuation industry as well as previous Tax Court litigation on this question. The "SRI curve" depicts market value as a percentage of selling price on its Y-axis and years since market introduction on its X-axis. All computers are aged from the date of delivery of the first unit of that model. Every other computer of the same model is aged from that point, even if it is manufactured years later. Thus, *671 if a computer is delivered five years after the initial introduction of that model, its residual value percentage is dependent upon the price on the original shipping date of that first model. According to Lyons, the computer market in 1978 had become relatively stable. This was due primarily to IBM's control over the marketplace. In mid-1978, the computer industry began to anticipate the introduction of a new computer family by IBM. Lyons recognized that the level of change presented by such a machine would have a dramatic impact on the SRI curve and that residual value predictions would be discounted depending upon reliability of such pre-introduction rumors. A similar revolutionary change had been rumored as far back as 1976, but was then disavowed by IBM senior management. Lyons opined that the price paid by petitioner for the equipment in this transaction was fair market value, and that the nine year residual value estimate for the equipment subject to all three end user leases would be between $ 82,000 and $ 279,000 or between seven and 25 percent of the purchase price of the equipment at the beginning of the transaction. Lyons offered a range of potential residual values *672 because he felt it was impossible to predict a specific number very far into the future. Lyons recognized that a major change did take place in the computer market on January 30, 1979 which had a dramatic impact on residual value predictions. At that time, IBM announced the 4300 family of computers. According to Lyons, the price performance improvement of 4:1 presented by the 4300 series had deleterious effects on the market for used mainframes. His residual valve prediction of 20 percent in the eleventh year would thus be accelerated to the eighth or ninth year. Lyons' residual value prediction of 7 to 25 percent did not take into account the January 1979 model introduction which would have reduced residual value predictions. However, his predictions also ignored the post-1980 price increases which inflated residual value predictions. Haftel's testimony supported Kennedy's statements with respect to market investigation and analysis. In his report, which was submitted into evidence, he set forth a January 1979 10th year residual value prediction for this equipment to be within a range of 20 percent plus or minus three percent of the original cost to the purchaser. It was *673 thus "excellent investment quality equipment." Furthermore, Haftel confirmed that the European or "secondary market" produced residual values and life expectancies of between 125 to 150 percent of those for the same machines in the United States. Haftel, a former IBM employee, has consistently discounted rumors in the computer industry, particularly with respect to IBM. According to him, IBM regularly injects rumors into the marketplace in order to freeze consumer decision making, thus chilling potential defections to competitive manufacturers. For that reason, he did not include the potential impact of the 4300 series in his January 1975 residual value prediction. To support its assertion that residual value projections would be higher with respect to the overseas computer market, petitioner called Mr. Robert Jones Hawkins. Mr. Hawkins based his projections on information compiled from his experience in the third party leasing industry. He testified that, as of January 31, 1979, this computer equipment would have a projected residual value of 30 percent nine years later. This estimate assumed, of course, that the equipment could be successfully remarketed in those countries. *674 Respondent's primary expert witness was S. Paul Blumenthal ("Blumenthal"). Blumenthal is Senior Vice-President of American Technology Appraisal Service and has testified extensively before various courts, including the Tax Court, on computer equipment valuation issues. He based his residual value estimates in this case on various periodicals, price data and personal experience. According to Blumenthal, the fair market value of the computer equipment in this case on January 31, 1979, was $ 947,419. His residual value projection of this equipment in 1988 was zero. In fact, he expected the 370 series to reach a value of zero by 1983. Blumenthal laid great importance upon the introduction of the E series. He also noted the price cutting associated with the introduction of the 303X machines, and the reduction in production of the 138 series and 148 series in 1978, as sure indications of a new model introduction. Blumenthal criticized Lyons' range of estimates as being too wide. In addition, he did not believe that Lyons had used all available contemporaneous information, i.e., that the 4300 series introduction was not correctly factored into his estimate. Blumenthal also flatly *675 disagreed with Hawkins' estimates as to residual values in the foreign markets. According to Blumenthal, the foreign market for computer equipment had disappeared in 1975, when IBM was caught dumping equipment in India. In addition, foreign markets were expensive to enter in that remarketing costs were prohibitive. Finally, he stated that there was a glut of computer equipment on the European market. On cross examination, Blumenthal admitted that there are as many as 10 different methods for computing residual values, and that the results could differ substantially depending on which method was used. He also admitted that the magnitude of the price performance improvement presented by the 4300 took the industry as a whole by surprise. Finally, Blumenthal admitted that there was a premium attached to purchasing computer equipment that was in place at the location of the end user. Respondent also produced Mr. Steven Rothschild ("Rothschild") as an expert witness. Rothschild had worked for IBM since 1959 in the computer manufacturing area. He had never testified in court as to computer equipment residual values. According to Rothschild, when a new generation of machines was *676 introduced into the computer market, the older computers became worthless from a manufacturing stand point. Based on this assumption, Rothschild testified that a reasonable projected residual value on January 31, 1979, of this equipment, on January 31, 1988, would have been zero. Rothschild also testified that, by careful attention to market data and periodical publications, one could predict when new computer announcements would occur. This, of course, is quite different from the viewpoint of Lyons and Haftel as to the predictability and reliability of rumors and pre-announcement data in the computer industry. Rothschild's experience in projections are based on the computer equipment values from the manufacturer's viewpoint. He admitted that he did not make projections with regard to the used computer market. He also admitted that he had very little familiarity with equipment leasing in general, and that he had not referred to any published used equipment values in making his 1979 residual value projections. This, of course, is quite different from the viewpoint of Lyons and Haftel as to the predictability and reliability of rumors and pre-announcement data in the computer industry. *677 Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in question. All rule references are to the Tax Court Rules of Practices and Procedures.↩
2. See Levy v. Commissioner,↩ 91 T.C. No.    (Nov. 2, 1988).
3. For a further chronology of the developments in the computer industry from 1960 to 1980, see the findings of fact in Gefen v. Commissioner,87 T.C. 1471, 1486-88↩ (1986).
4. See sec. 1.183-2(b), Income Tax Regs.↩
5. This is the way the paragraph read in the Limited Recourse Promissory Note. However, we recognize that it seems to be nonsensical.↩
6. Formerly section 6621(d)↩.